## LEGAL SERVICES CORPORATION *v.*
## VELAZQUEZ ET AL.

No. 99–603.   Argued October 4, 2000—Decided February 28, 2001*

*Together with No. 99–960, *United States* v. *Velazquez et al.*, also on certiorari to the same court.

534

KENNEDY, J., delivered the opinion of the Court, in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed a dissenting opinion in which REHNQUIST, C. J., and O'CONNOR and THOMAS, JJ., joined, *post*, p. 549.

*Alan Levine* argued the cause for petitioner in No. 99–603. With him on the briefs was *Stephen L. Ascher.*

*Deputy Solicitor General Kneedler* argued the cause for the United States in No. 99–960. With him on the briefs were *Solicitor General Waxman, Acting Assistant Attorney General Ogden, Beth S. Brinkmann, Barbara L. Herwig,* and *Matthew M. Collette.*

*Burt Neuborne* argued the cause for respondents in both cases. With him on the brief were *Laura K. Abel, Kimani*

Paul-Emile, Paul K. Sonn, David S. Udell, Peter M. Fishbein, and Alan E. Rothman.†

JUSTICE KENNEDY delivered the opinion of the Court.

In 1974, Congress enacted the Legal Services Corporation Act, 88 Stat. 378, 42 U. S. C. § 2996 *et seq.* The Act establishes the Legal Services Corporation (LSC) as a District of Columbia nonprofit corporation. LSC's mission is to distribute funds appropriated by Congress to eligible local grantee organizations "for the purpose of providing financial support for legal assistance in noncriminal proceedings or matters to persons financially unable to afford legal assistance." § 2996b(a).

LSC grantees consist of hundreds of local organizations governed, in the typical case, by local boards of directors. In many instances the grantees are funded by a combination of LSC funds and other public or private sources. The grantee organizations hire and supervise lawyers to provide free legal assistance to indigent clients. Each year LSC appropriates funds to grantees or recipients that hire and supervise lawyers for various professional activities, including representation of indigent clients seeking welfare benefits.

This suit requires us to decide whether one of the conditions imposed by Congress on the use of LSC funds violates the First Amendment rights of LSC grantees and their clients. For purposes of our decision, the restriction, to be quoted in further detail, prohibits legal representation

---

†Briefs of *amici curiae* urging reversal were filed for the Pacific Legal Foundation by *John H. Findley;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *R. Shawn Gunnarson.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Arthur N. Eisenberg* and *Steven R. Shapiro;* and for the New York State Bar Association et al. by *Bruce A. Green* and *Lawrence S. Lustberg.*

*Frederick A. O. Schwarz, Jr.,* filed a brief for the American Judicature Society as *amicus curiae.*

funded by recipients of LSC moneys if the representation involves an effort to amend or otherwise challenge existing welfare law. As interpreted by the LSC and by the Government, the restriction prevents an attorney from arguing to a court that a state statute conflicts with a federal statute or that either a state or federal statute by its terms or in its application is violative of the United States Constitution.

Lawyers employed by New York City LSC grantees, together with private LSC contributors, LSC indigent clients, and various state and local public officials whose governments contribute to LSC grantees, brought suit in the United States District Court for the Eastern District of New York to declare the restriction, among other provisions of the Act, invalid. The United States Court of Appeals for the Second Circuit approved an injunction against enforcement of the provision as an impermissible viewpoint-based discrimination in violation of the First Amendment, 164 F. 3d 757 (1999). We granted certiorari, and the parties who commenced the suit in the District Court are here as respondents. The LSC as petitioner is joined by the Government of the United States, which had intervened in the District Court. We agree that the restriction violates the First Amendment, and we affirm the judgment of the Court of Appeals.

I

From the inception of the LSC, Congress has placed restrictions on its use of funds. For instance, the LSC Act prohibits recipients from making available LSC funds, program personnel, or equipment to any political party, to any political campaign, or for use in "advocating or opposing any ballot measures." 42 U. S. C. § 2996e(d)(4). See § 2996e(d)(3). The Act further proscribes use of funds in most criminal proceedings and in litigation involving nontherapeutic abortions, secondary school desegregation, military desertion, or violations of the Selective Service statute. §§ 2996f(b)(8)–(10) (1994 ed. and Supp. IV). Fund recipients

are barred from bringing class-action suits unless express approval is obtained from LSC. § 2996e(d)(5).

The restrictions at issue were part of a compromise set of restrictions enacted in the Omnibus Consolidated Rescissions and Appropriations Act of 1996 (1996 Act), § 504, 110 Stat. 1321–53, and continued in each subsequent annual appropriations Act. The relevant portion of § 504(a)(16) prohibits funding of any organization

> "that initiates legal representation or participates in any other way, in litigation, lobbying, or rulemaking, involving an effort to reform a Federal or State welfare system, except that this paragraph shall not be construed to preclude a recipient from representing an individual eligible client who is seeking specific relief from a welfare agency if such relief does not involve an effort to amend or otherwise challenge existing law in effect on the date of the initiation of the representation."

The prohibitions apply to all of the activities of an LSC grantee, including those paid for by non-LSC funds. §§ 504(d)(1) and (2). We are concerned with the statutory provision which excludes LSC representation in cases which "involve an effort to amend or otherwise challenge existing law in effect on the date of the initiation of the representation."

In 1997, LSC adopted final regulations clarifying § 504(a)(16). 45 CFR pt. 1639 (1999). LSC interpreted the statutory provision to allow indigent clients to challenge welfare agency determinations of benefit ineligibility under interpretations of existing law. For example, an LSC grantee could represent a welfare claimant who argued that an agency made an erroneous factual determination or that an agency misread or misapplied a term contained in an existing welfare statute. According to LSC, a grantee in that position could argue as well that an agency policy violated existing law. § 1639.4. Under LSC's interpretation, however,

grantees could not accept representations designed to change welfare laws, much less argue against the constitutionality or statutory validity of those laws. Brief for Petitioner in No. 99–603, p. 7. Even in cases where constitutional or statutory challenges became apparent after representation was well under way, LSC advised that its attorneys must withdraw. *Ibid.*

After the instant suit was filed in the District Court alleging the restrictions on the use of LSC funds violated the First Amendment, see 985 F. Supp. 323 (1997), the court denied a preliminary injunction, finding no probability of success on the merits. *Id.*, at 344.

On appeal, the Court of Appeals for the Second Circuit affirmed in part and reversed in part. 164 F. 3d 757 (1999). As relevant for our purposes, the court addressed respondents' challenges to the restrictions in § 504(a)(16). It concluded the section specified four categories of prohibited activities, of which "three appear[ed] to prohibit the type of activity named regardless of viewpoint, while one might be read to prohibit the activity only when it seeks reform." *Id.*, at 768. The court upheld the restrictions on litigation, lobbying, and rulemaking "involving an effort to reform a Federal or State welfare system," since all three prohibited grantees' involvement in these activities regardless of the side of the issue. *Id.*, at 768–769.

The court next considered the exception to § 504(a)(16) that allows representation of "'an individual eligible client who is seeking specific relief from a welfare agency.'" The court invalidated, as impermissible viewpoint discrimination, the qualification that representation could "not involve an effort to amend or otherwise challenge existing law," because it "clearly seeks to discourage challenges to the status quo." *Id.*, at 769–770.

Left to decide what part of the 1996 Act to strike as invalid, the court concluded that congressional intent regarding severability was unclear. It decided to "invalidate the

smallest possible portion of the statute, excising only the viewpoint-based proviso rather than the entire exception of which it is a part." *Id.*, at 773.

Dissenting in part, Judge Jacobs agreed with the majority except for its holding that the proviso banning challenges to existing welfare laws effected impermissible viewpoint-based discrimination. The provision, in his view, was permissible because it merely defined the scope of services to be funded. *Id.*, at 773–778 (opinion concurring in part and dissenting in part).

LSC filed a petition for certiorari challenging the Court of Appeals' conclusion that the § 504(a)(16) suits-for-benefits proviso was unconstitutional. We granted certiorari, 529 U. S. 1052 (2000).

## II

The United States and LSC rely on *Rust* v. *Sullivan*, 500 U. S. 173 (1991), as support for the LSC program restrictions. In *Rust*, Congress established program clinics to provide subsidies for doctors to advise patients on a variety of family planning topics. Congress did not consider abortion to be within its family planning objectives, however, and it forbade doctors employed by the program from discussing abortion with their patients. *Id.*, at 179–180. Recipients of funds under Title X of the Public Health Service Act, §§ 1002, 1008, as added, 84 Stat. 1506, 1508, 42 U. S. C. §§ 300a, 300a–6, challenged the Act's restriction that provided that none of the Title X funds appropriated for family planning services could "be used in programs where abortion is a method of family planning." § 300a–6. The recipients argued that the regulations constituted impermissible viewpoint discrimination favoring an antiabortion position over a proabortion approach in the sphere of family planning. 500 U. S., at 192. They asserted as well that Congress had imposed an unconstitutional condition on recipients of federal funds by requiring them to relinquish their right to engage

in abortion advocacy and counseling in exchange for the subsidy. *Id.*, at 196.

We upheld the law, reasoning that Congress had not discriminated against viewpoints on abortion, but had "merely chosen to fund one activity to the exclusion of the other." *Id.*, at 193. The restrictions were considered necessary "to ensure that the limits of the federal program [were] observed." *Ibid.* Title X did not single out a particular idea for suppression because it was dangerous or disfavored; rather, Congress prohibited Title X doctors from counseling that was outside the scope of the project. *Id.*, at 194–195.

The Court in *Rust* did not place explicit reliance on the rationale that the counseling activities of the doctors under Title X amounted to governmental speech; when interpreting the holding in later cases, however, we have explained *Rust* on this understanding. We have said that viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker, see *Board of Regents of Univ. of Wis. System v. Southworth*, 529 U. S. 217, 229, 235 (2000), or instances, like *Rust*, in which the government "used private speakers to transmit specific information pertaining to its own program." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 833 (1995). As we said in *Rosenberger*, "[w]hen the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." *Ibid.* The latitude which may exist for restrictions on speech where the government's own message is being delivered flows in part from our observation that, "[w]hen the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or con-

trary position." *Board of Regents of Univ. of Wis. System* v. *Southworth, supra,* at 235.

Neither the latitude for government speech nor its rationale applies to subsidies for private speech in every instance, however. As we have pointed out, "[i]t does not follow . . . that viewpoint-based restrictions are proper when the [government] does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Rosenberger, supra,* at 834.

Although the LSC program differs from the program at issue in *Rosenberger* in that its purpose is not to "encourage a diversity of views," the salient point is that, like the program in *Rosenberger,* the LSC program was designed to facilitate private speech, not to promote a governmental message. Congress funded LSC grantees to provide attorneys to represent the interests of indigent clients. In the specific context of § 504(a)(16) suits for benefits, an LSC-funded attorney speaks on the behalf of the client in a claim against the government for welfare benefits. The lawyer is not the government's speaker. The attorney defending the decision to deny benefits will deliver the government's message in the litigation. The LSC lawyer, however, speaks on the behalf of his or her private, indigent client. Cf. *Polk County* v. *Dodson,* 454 U. S. 312, 321–322 (1981) (holding that a public defender does not act "under color of state law" because he "works under canons of professional responsibility that mandate his exercise of independent judgment on behalf of the client" and because there is an "assumption that counsel will be free of state control").

The Government has designed this program to use the legal profession and the established Judiciary of the States and the Federal Government to accomplish its end of assisting welfare claimants in determination or receipt of their benefits. The advice from the attorney to the client and the advocacy by the attorney to the courts cannot be classified

as governmental speech even under a generous understanding of the concept. In this vital respect this suit is distinguishable from *Rust.*

The private nature of the speech involved here, and the extent of LSC's regulation of private expression, are indicated further by the circumstance that the Government seeks to use an existing medium of expression and to control it, in a class of cases, in ways which distort its usual functioning. Where the government uses or attempts to regulate a particular medium, we have been informed by its accepted usage in determining whether a particular restriction on speech is necessary for the program's purposes and limitations. In *FCC* v. *League of Women Voters of Cal.,* 468 U. S. 364 (1984), the Court was instructed by its understanding of the dynamics of the broadcast industry in holding that prohibitions against editorializing by public radio networks were an impermissible restriction, even though the Government enacted the restriction to control the use of public funds. The First Amendment forbade the Government from using the forum in an unconventional way to suppress speech inherent in the nature of the medium. See *id.,* at 396–397. In *Arkansas Ed. Television Comm'n* v. *Forbes,* 523 U. S. 666, 676 (1998), the dynamics of the broadcasting system gave station programmers the right to use editorial judgment to exclude certain speech so that the broadcast message could be more effective. And in *Rosenberger,* the fact that student newspapers expressed many different points of view was an important foundation for the Court's decision to invalidate viewpoint-based restrictions. 515 U. S., at 836.

When the government creates a limited forum for speech, certain restrictions may be necessary to define the limits and purposes of the program. *Perry Ed. Assn.* v. *Perry Local Educators' Assn.,* 460 U. S. 37 (1983); see also *Lamb's Chapel* v. *Center Moriches Union Free School Dist.,* 508 U. S. 384 (1993). The same is true when the government establishes a subsidy for specified ends. *Rust* v. *Sullivan,* 500 U. S. 173

(1991). As this suit involves a subsidy, limited forum cases such as *Perry, Lamb's Chapel,* and *Rosenberger* may not be controlling in a strict sense, yet they do provide some instruction. Here the program presumes that private, nongovernmental speech is necessary, and a substantial restriction is placed upon that speech. At oral argument and in its briefs the LSC advised us that lawyers funded in the Government program may not undertake representation in suits for benefits if they must advise clients respecting the questionable validity of a statute which defines benefit eligibility and the payment structure. The limitation forecloses advice or legal assistance to question the validity of statutes under the Constitution of the United States. It extends further, it must be noted, so that state statutes inconsistent with federal law under the Supremacy Clause may be neither challenged nor questioned.

By providing subsidies to LSC, the Government seeks to facilitate suits for benefits by using the state and federal courts and the independent bar on which those courts depend for the proper performance of their duties and responsibilities. Restricting LSC attorneys in advising their clients and in presenting arguments and analyses to the courts distorts the legal system by altering the traditional role of the attorneys in much the same way broadcast systems or student publication networks were changed in the limited forum cases we have cited. Just as government in those cases could not elect to use a broadcasting network or a college publication structure in a regime which prohibits speech necessary to the proper functioning of those systems, see *Arkansas Ed. Television Comm'n, supra,* and *Rosenberger, supra,* it may not design a subsidy to effect this serious and fundamental restriction on advocacy of attorneys and the functioning of the judiciary.

LSC has advised us, furthermore, that upon determining a question of statutory validity is present in any anticipated or pending case or controversy, the LSC-funded attorney

must cease the representation at once. This is true whether the validity issue becomes apparent during initial attorney-client consultations or in the midst of litigation proceedings. A disturbing example of the restriction was discussed during oral argument before the Court. It is well understood that when there are two reasonable constructions for a statute, yet one raises a constitutional question, the Court should prefer the interpretation which avoids the constitutional issue. *Gomez* v. *United States*, 490 U. S. 858, 864 (1989); *Ashwander* v. *TVA*, 297 U. S. 288, 346–348 (1936) (Brandeis, J., concurring). Yet, as the LSC advised the Court, if, during litigation, a judge were to ask an LSC attorney whether there was a constitutional concern, the LSC attorney simply could not answer. Tr. of Oral Arg. 8–9.

Interpretation of the law and the Constitution is the primary mission of the judiciary when it acts within the sphere of its authority to resolve a case or controversy. *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803) ("It is emphatically the province and the duty of the judicial department to say what the law is"). An informed, independent judiciary presumes an informed, independent bar. Under § 504(a)(16), however, cases would be presented by LSC attorneys who could not advise the courts of serious questions of statutory validity. The disability is inconsistent with the proposition that attorneys should present all the reasonable and well-grounded arguments necessary for proper resolution of the case. By seeking to prohibit the analysis of certain legal issues and to truncate presentation to the courts, the enactment under review prohibits speech and expression upon which courts must depend for the proper exercise of the judicial power. Congress cannot wrest the law from the Constitution which is its source. "Those then who controvert the principle that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the constitution, and see only the law." *Id.*, at 178.

The restriction imposed by the statute here threatens severe impairment of the judicial function. Section 504(a)(16) sifts out cases presenting constitutional challenges in order to insulate the Government's laws from judicial inquiry. If the restriction on speech and legal advice were to stand, the result would be two tiers of cases. In cases where LSC counsel were attorneys of record, there would be lingering doubt whether the truncated representation had resulted in complete analysis of the case, full advice to the client, and proper presentation to the court. The courts and the public would come to question the adequacy and fairness of professional representations when the attorney, either consciously to comply with this statute or unconsciously to continue the representation despite the statute, avoided all reference to questions of statutory validity and constitutional authority. A scheme so inconsistent with accepted separation-of-powers principles is an insufficient basis to sustain or uphold the restriction on speech.

It is no answer to say the restriction on speech is harmless because, under LSC's interpretation of the Act, its attorneys can withdraw. This misses the point. The statute is an attempt to draw lines around the LSC program to exclude from litigation those arguments and theories Congress finds unacceptable but which by their nature are within the province of the courts to consider.

The restriction on speech is even more problematic because in cases where the attorney withdraws from a representation, the client is unlikely to find other counsel. The explicit premise for providing LSC attorneys is the necessity to make available representation "to persons financially unable to afford legal assistance." 42 U. S. C. § 2996(a)(3). There often will be no alternative source for the client to receive vital information respecting constitutional and statutory rights bearing upon claimed benefits. Thus, with respect to the litigation services Congress has funded, there is no alternative channel for expression of the advocacy Con-

gress seeks to restrict. This is in stark contrast to *Rust.* There, a patient could receive the approved Title X family planning counseling funded by the Government and later could consult an affiliate or independent organization to receive abortion counseling. Unlike indigent clients who seek LSC representation, the patient in *Rust* was not required to forfeit the Government-funded advice when she also received abortion counseling through alternative channels. Because LSC attorneys must withdraw whenever a question of a welfare statute's validity arises, an individual could not obtain joint representation so that the constitutional challenge would be presented by a non-LSC attorney, and other, permitted, arguments advanced by LSC counsel.

Finally, LSC and the Government maintain that § 504(a)(16) is necessary to define the scope and contours of the federal program, a condition that ensures funds can be spent for those cases most immediate to congressional concern. In support of this contention, they suggest the challenged limitation takes into account the nature of the grantees' activities and provides limited congressional funds for the provision of simple suits for benefits. In petitioners' view, the restriction operates neither to maintain the current welfare system nor insulate it from attack; rather, it helps the current welfare system function in a more efficient and fair manner by removing from the program complex challenges to existing welfare laws.

The effect of the restriction, however, is to prohibit advice or argumentation that existing welfare laws are unconstitutional or unlawful. Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise. Here, notwithstanding Congress' purpose to confine and limit its program, the restriction operates to insulate current welfare laws from constitutional scrutiny and certain other legal challenges, a condition implicating central First Amendment concerns. In no lawsuit funded by the Govern-

ment can the LSC attorney, speaking on behalf of a private client, challenge existing welfare laws. As a result, arguments by indigent clients that a welfare statute is unlawful or unconstitutional cannot be expressed in this Government-funded program for petitioning the courts, even though the program was created for litigation involving welfare benefits, and even though the ordinary course of litigation involves the expression of theories and postulates on both, or multiple, sides of an issue.

It is fundamental that the First Amendment " 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' " *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 269 (1964) (quoting *Roth* v. *United States,* 354 U. S. 476, 484 (1957)). There can be little doubt that the LSC Act funds constitutionally protected expression; and in the context of this statute there is no programmatic message of the kind recognized in *Rust* and which sufficed there to allow the Government to specify the advice deemed necessary for its legitimate objectives. This serves to distinguish § 504(a)(16) from any of the Title X program restrictions upheld in *Rust,* and to place it beyond any congressional funding condition approved in the past by this Court.

Congress was not required to fund an LSC attorney to represent indigent clients; and when it did so, it was not required to fund the whole range of legal representations or relationships. The LSC and the United States, however, in effect ask us to permit Congress to define the scope of the litigation it funds to exclude certain vital theories and ideas. The attempted restriction is designed to insulate the Government's interpretation of the Constitution from judicial challenge. The Constitution does not permit the Government to confine litigants and their attorneys in this manner. We must be vigilant when Congress imposes rules and conditions which in effect insulate its own laws from legitimate judicial challenge. Where private speech is involved, even

Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest. *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 548 (1983); *Speiser* v. *Randall*, 357 U. S. 513, 519 (1958).

For the reasons we have set forth, the funding condition is invalid. The Court of Appeals considered whether the language restricting LSC attorneys could be severed from the statute so that the remaining portions would remain operative. It reached the reasoned conclusion to invalidate the fragment of § 504(a)(16) found contrary to the First Amendment, leaving the balance of the statute operative and in place. That determination was not discussed in the briefs of either party or otherwise contested here, and in the exercise of our discretion and prudential judgment we decline to address it.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE THOMAS join, dissenting.

Section 504(a)(16) of the Omnibus Consolidated Rescissions and Appropriations Act of 1996 (Appropriations Act) defines the scope of a federal spending program. It does not directly regulate speech, and it neither establishes a public forum nor discriminates on the basis of viewpoint. The Court agrees with all this, yet applies a novel and unsupportable interpretation of our public-forum precedents to declare § 504(a)(16) facially unconstitutional. This holding not only has no foundation in our jurisprudence; it is flatly contradicted by a recent decision that is on all fours with the present cases. Having found the limitation upon the spending program unconstitutional, the Court then declines to consider the question of severability, allowing a judgment to stand that lets the program go forward under a version of

the statute Congress never enacted. I respectfully dissent from both aspects of the judgment.

I

The Legal Services Corporation Act of 1974 (LSC Act), 42 U. S. C. § 2996 *et seq.*, is a federal subsidy program, the stated purpose of which is to "provid[e] financial support for legal assistance in noncriminal proceedings or matters to persons financially unable to afford legal assistance." § 2996b(a). Congress, recognizing that the program could not serve its purpose unless it was "kept free from the influence of or use by it of political pressures," § 2996(5), has from the program's inception tightly regulated the use of its funds. See *ante*, at 537–538. No Legal Services Corporation (LSC) funds may be used, for example, for "encouraging . . . labor or anti-labor activities," § 2996f(b)(6), for "litigation relating to the desegregation of any elementary or secondary school or school system," § 2996f(b)(9), or for "litigation which seeks to procure a nontherapeutic abortion," § 2996f(b)(8). Congress discovered through experience, however, that these restrictions did not exhaust the politically controversial uses to which LSC funds could be put.

Accordingly, in 1996 Congress added new restrictions to the LSC Act and strengthened existing restrictions. Among the new restrictions is the one at issue here. Section 504(a)(16) of the Appropriations Act, 110 Stat. 1321–55 to 1321–56, withholds LSC funds from every entity that "participates in any . . . way . . . in litigation, lobbying, or rulemaking . . . involving an effort to reform a Federal or State welfare system." It thus bans LSC-funded entities from participating on either side of litigation involving such statutes, from participating in rulemaking relating to the implementation of such legislation, and from lobbying Congress itself regarding any proposed changes to such legislation. See 45 CFR § 1639.3 (2000).

The restrictions relating to rulemaking and lobbying are superfluous; they duplicate general prohibitions on the use of LSC funds for those activities found elsewhere in the Appropriations Act. See §§ 504(a)(2), (3), (4). The restriction on litigation, however, is unique, and it contains a proviso specifying what the restriction does not cover. Funding recipients may "represen[t] an individual eligible client who is seeking specific relief from a welfare agency if such relief does not involve an effort to amend or otherwise challenge existing law in effect on the date of the initiation of the representation." The LSC declares in its brief, and respondents do not deny, that under these provisions the LSC can sponsor neither challenges to *nor* defenses of existing welfare reform law, Brief for Petitioner in No. 99–603, p. 29. The litigation ban is symmetrical: Litigants challenging the covered statutes or regulations do not receive LSC funding, and neither do litigants defending those laws against challenge.

If a suit for benefits raises a claim outside the scope of the LSC program, the LSC-funded lawyer may not participate in the suit. As the Court explains, if LSC-funded lawyers anticipate that a forbidden claim will arise in a prospective client's suit, they "may not undertake [the] representation," *ante*, at 544. Likewise, if a forbidden claim arises unexpectedly at trial, "LSC-funded attorney[s] must cease the representation at once," *ante*, at 544–545. See also Brief for Petitioner in No. 99–603, at 7, n. 4 (if the issue arises at trial, "the lawyer should discontinue the representation 'consistent with the applicable rules of professional responsibility'"). The lawyers may, however, and indeed *must* explain to the client why they cannot represent him. See 164 F. 3d 757, 765 (CA2 1999). They are also free to express their views of the legality of the welfare law to the client, and they may refer the client to another attorney who can accept the representation, *ibid.* See 985 F. Supp. 323, 335–336 (EDNY 1997).

## II

The LSC Act is a federal subsidy program, not a federal regulatory program, and "[t]here is a basic difference between [the two]." *Maher* v. *Roe*, 432 U. S. 464, 475 (1977). Regulations directly restrict speech; subsidies do not. Subsidies, it is true, may *indirectly* abridge speech, but only if the funding scheme is " 'manipulated' to have a 'coercive effect' " on those who do not hold the subsidized position. *National Endowment for Arts* v. *Finley*, 524 U. S. 569, 587 (1998) (quoting *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 237 (1987) (SCALIA, J., dissenting)). Proving unconstitutional coercion is difficult enough when the spending program has universal coverage and excludes only certain speech—such as a tax exemption scheme excluding lobbying expenses. The Court has found such programs unconstitutional only when the exclusion was "aimed at the suppression of dangerous ideas." *Speiser* v. *Randall*, 357 U. S. 513, 519 (1958) (internal quotation marks omitted); see also *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 550 (1983). Proving the requisite coercion is harder still when a spending program is not universal but limited, providing benefits to a restricted number of recipients, see *Rust* v. *Sullivan*, 500 U. S. 173, 194–195 (1991). The Court has found such selective spending unconstitutionally coercive only once, when the government created a public forum with the spending program but then discriminated in distributing funding within the forum on the basis of viewpoint. See *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829–830 (1995). When the limited spending program does not create a public forum, proving coercion is virtually impossible, because simply denying a subsidy "does not 'coerce' belief," *Lyng* v. *Automobile Workers*, 485 U. S. 360, 369 (1988), and because the criterion of unconstitutionality is whether denial of the subsidy threatens "to drive certain ideas or viewpoints from the marketplace," *National Endowment for Arts* v. *Finley, supra*, at 587 (internal quota-

tion marks omitted). Absent such a threat, "the Government may allocate . . . funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." 524 U. S., at 587–588.

In *Rust* v. *Sullivan, supra,* the Court applied these principles to a statutory scheme that is in all relevant respects indistinguishable from § 504(a)(16). The statute in *Rust* authorized grants for the provision of family planning services, but provided that "[n]one of the funds . . . shall be used in programs where abortion is a method of family planning." *Id.,* at 178. Valid regulations implementing the statute required funding recipients to refer pregnant clients "for appropriate prenatal . . . services by furnishing a list of available providers that promote the welfare of mother and unborn child," but forbade them to refer a pregnant woman specifically to an abortion provider, even upon request. *Id.,* at 180. We rejected a First Amendment free-speech challenge to the funding scheme, explaining that "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem another way." *Id.,* at 193. This was not, we said, the type of "discriminat[ion] on the basis of viewpoint" that triggers strict scrutiny, *ibid.,* because the "'decision not to subsidize the exercise of a fundamental right does not infringe the right,'" *ibid.* (quoting *Regan* v. *Taxation With Representation of Wash., supra,* at 549).

The same is true here. The LSC Act, like the scheme in *Rust,* see 500 U. S., at 200, does not create a public forum. Far from encouraging a diversity of views, it has always, as the Court accurately states, "placed restrictions on its use of funds," *ante,* at 537. Nor does § 504(a)(16) discriminate on the basis of viewpoint, since it funds neither challenges to nor defenses of existing welfare law. The provision simply declines to subsidize a certain class of litigation, and under

*Rust* that decision "does not infringe the right" to bring such litigation. Cf. *Ortwein* v. *Schwab*, 410 U. S. 656, 658–660, and n. 5 (1973) *(per curiam)* (government not required by First Amendment or Due Process Clause to waive filing fee for welfare benefits litigation). The Court's repeated claims that § 504(a)(16) "restricts" and "prohibits" speech, see, *e. g.*, *ante*, at 545, 546, and "insulates" laws from judicial review, see, *e. g.*, *ante*, at 547, are simply baseless. No litigant who, in the absence of LSC funding, would bring a suit challenging existing welfare law is deterred from doing so by § 504(a)(16). *Rust* thus controls these cases and compels the conclusion that § 504(a)(16) is constitutional.

The Court contends that *Rust* is different because the program at issue subsidized government speech, while the LSC funds private speech. See *ante*, at 541–542. This is so unpersuasive it hardly needs response. If the private doctors' confidential advice to their patients at issue in *Rust* constituted "government speech," it is hard to imagine what subsidized speech would *not* be government speech. Moreover, the majority's contention that the subsidized speech in these cases is not government speech because the lawyers have a professional obligation to represent the interests of their clients founders on the reality that the doctors in *Rust* had a professional obligation to serve the interests of their patients, see 500 U. S., at 214 (Blackmun, J., dissenting) ("ethical responsibilities of the medical profession")—which at the time of *Rust* we had held to be highly relevant to the permissible scope of federal regulation, see *Thornburgh* v. *American College of Obstetricians and Gynecologists*, 476 U. S. 747, 763 (1986) ("professional responsibilities" of physicians), overruled in part on other grounds, *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992). Even respondents agree that "the true speaker in *Rust* was not the government, but a doctor." Brief for Respondents 19, n. 17.

The Court further asserts that these cases are different from *Rust* because the welfare funding restriction "seeks to

use an existing medium of expression and to control it . . . in ways which distort its usual functioning," *ante*, at 543. This is wrong on both the facts and the law. It is wrong on the law because there is utterly no precedent for the novel and facially implausible proposition that the First Amendment has anything to do with government funding that—though it does not actually abridge anyone's speech—"distorts an existing medium of expression." None of the three cases cited by the Court mentions such an odd principle. In *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, the point critical to the Court's analysis was not, as the Court would have it, that it is part of the "usual functioning" of student newspapers to "expres[s] many different points of view," *ante*, at 543 (it surely is not), but rather *that the spending program itself* had been created "to encourage a diversity of views from private speakers," 515 U. S., at 834. What could not be distorted was *the public forum* that the spending program had created. As for *Arkansas Ed. Television Comm'n* v. *Forbes*, 523 U. S. 666 (1998), that case discussed the nature of television broadcasting, not to determine whether government regulation would alter its "usual functioning" and thus violate the First Amendment (no government regulation was even at issue in the case), but rather to determine whether state-owned television is a "public forum" under our First Amendment jurisprudence. *Id.*, at 673–674. And finally, the passage the Court cites from *FCC* v. *League of Women Voters of Cal.*, 468 U. S. 364, 396–397 (1984), says *nothing whatever* about "using the forum [of public radio] in an unconventional way to suppress speech inherent in the nature of the medium," *ante*, at 543. It discusses why the Government's asserted interest in "preventing [public radio] stations from becoming a privileged outlet for the political and ideological opinions of station owners and managers," 468 U. S., at 396 (internal quotation marks omitted), was insubstantial and thus could not justify the statute's restriction on editorializing. Even worse for the Court, after invalidat-

ing the restriction on this conventional First Amendment ground, *League of Women Voters* goes on to say that "[o]f course," the restriction on editorializing "would plainly be valid" if "Congress were to adopt a revised version of [the statute] that permitted [public radio] stations to establish 'affiliate' organizations which could then use the station's facilities to editorialize with nonfederal funds." *Id.*, at 400. But of course that is the case here. Regulations permit funding recipients to establish affiliate organizations to conduct litigation and other activities that fall outside the scope of the LSC program. See 45 CFR pt. 1610 (2000). Far from supporting the Court's nondistortion analysis, *League of Women Voters* dooms the Court's case.

The Court's "nondistortion" principle is also wrong on the facts, since there is no basis for believing that § 504(a)(16), by causing "cases [to] be presented by LSC attorneys who [can]not advise the courts of serious questions of statutory validity," *ante*, at 545, will distort the operation of the courts. It may well be that the bar of § 504(a)(16) will cause LSC-funded attorneys to decline or to withdraw from cases that involve statutory validity. But that means at most that fewer statutory challenges to welfare laws will be presented to the courts because of the unavailability of free legal services for that purpose. So what? The same result would ensue from excluding LSC-funded lawyers from welfare litigation entirely. It is not the mandated, nondistortable function of the courts to inquire into all "serious questions of statutory validity" in all cases. Courts must consider only those questions of statutory validity *that are presented by litigants*, and if the Government chooses not to subsidize the presentation of some such questions, that in no way "distorts" the courts' role. It is remarkable that a Court that has so studiously avoided deciding whether Congress could entirely eliminate federal *jurisdiction* over certain matters, see, *e. g., Webster* v. *Doe,* 486 U. S. 592, 603 (1988); *Bowen* v. *Michigan Academy of Family Physicians,* 476 U. S. 667,

681, n. 12 (1986), would be so eager to hold the much lesser step of declining to subsidize the litigation unconstitutional under the First Amendment.

Nor will the judicial opinions produced by LSC cases systematically distort the interpretation of welfare laws. Judicial decisions do not stand as binding "precedent" for points that were not raised, not argued, and hence not analyzed. See, *e. g., United States* v. *Verdugo-Urquidez,* 494 U. S. 259, 272 (1990); *Hagans* v. *Lavine,* 415 U. S. 528, 533, n. 5 (1974); *United States* v. *L. A. Tucker Truck Lines, Inc.,* 344 U. S. 33, 37–38 (1952); *United States* v. *More,* 3 Cranch 159, 172 (1805) (Marshall, C. J.). The statutory validity that courts assume in LSC cases will remain open for full determination in later cases.

Finally, the Court is troubled "because in cases where the attorney withdraws from a representation, the client is unlikely to find other counsel." *Ante,* at 546. That is surely irrelevant, since it leaves the welfare recipient in no *worse* condition than he would have been in had the LSC program never been enacted. Respondents properly concede that even if welfare claimants cannot obtain a lawyer anywhere else, the Government is not required to provide one. Brief for Respondents 16; accord, *Goldberg* v. *Kelly,* 397 U. S. 254, 270 (1970) (government not required to provide counsel at hearing regarding termination of welfare benefits). It is hard to see how providing free legal services to some welfare claimants (those whose claims do not challenge the applicable statutes) while not providing it to others is beyond the range of legitimate legislative choice. *Rust* rejected a similar argument:

> "Petitioners contend, however, that most Title X clients are effectively precluded by indigency and poverty from seeing a health-care provider who will provide abortion-related services. But once again, even these Title X clients are in no worse position than if Congress had never enacted Title X. The financial constraints

that restrict an indigent woman's ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortion, but rather of her indigency." 500 U. S., at 203 (internal quotation marks omitted).

The only conceivable argument that can be made for distinguishing *Rust* is that there even patients who wished to receive abortion counseling could receive the nonabortion services that the Government-funded clinic offered, whereas here some potential LSC clients who wish to receive representation on a benefits claim that does not challenge the statutes will be unable to do so because their cases raise a reform claim that an LSC lawyer may not present. This difference, of course, is required by the same ethical canons that the Court elsewhere does not wish to distort. Rather than sponsor "truncated representation," *ante*, at 546, Congress chose to subsidize only those cases in which the attorneys it subsidized could work freely. See, *e. g.*, 42 U. S. C. § 2996(6) ("[A]ttorneys providing legal assistance must have full freedom to protect the best interests of their clients"). And it is impossible to see how this difference from *Rust* has any bearing upon the First Amendment question, which, to repeat, is whether the funding scheme is "'manipulated' to have a 'coercive effect'" on those who do not hold the subsidized position. *National Endowment for Arts* v. *Finley*, 524 U. S., at 587 (quoting *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S., at 237 (SCALIA, J., dissenting)). It could be claimed to have such an effect if the client in a case ineligible for LSC representation could eliminate the ineligibility by waiving the claim that the statute is invalid; but he cannot. No *conceivable* coercive effect exists.

This has been a very long discussion to make a point that is embarrassingly simple: The LSC subsidy neither prevents anyone from speaking nor coerces anyone to change speech, and is indistinguishable in all relevant respects from the sub-

sidy upheld in *Rust* v. *Sullivan, supra.* There is no legitimate basis for declaring § 504(a)(16) facially unconstitutional.

## III

Even were I to accept the Court's First Amendment analysis, I could not join its decision to conclude this litigation without reaching the issue of severability. That issue, although decided by the Second Circuit, was not included within the question on which certiorari was granted, and, as the Court points out, was not briefed or argued here. I nonetheless think it an abuse of discretion to ignore it.

The Court has said that "[w]e may consider questions outside the scope of the limited order [granting certiorari] when resolution of those questions is necessary for the proper disposition of the case." *Piper Aircraft Co.* v. *Reyno,* 454 U. S. 235, 246–247, n. 12 (1981). I think it necessary to a "proper disposition" here because the statute concocted by the Court of Appeals bears little resemblance to what Congress enacted, funding without restriction welfare-benefits litigation that Congress funded only under the limitations of § 504(a)(16). Although no party briefed severability in *Denver Area Ed. Telecommunications Consortium, Inc.* v. *FCC,* 518 U. S. 727 (1996), the Justices finding partial unconstitutionality considered it necessary to address the issue. *Id.,* at 767 (plurality opinion) ("[W]e must ask whether § 10(a) is severable"); accord, *New York* v. *United States,* 505 U. S. 144, 186 (1992). I think we have that same obligation here. Moreover, by exercising our "discretion" to leave the severability question open, we fail to resolve the basic, real-world dispute at issue: whether LSC attorneys may represent welfare claimants who challenge the applicable welfare laws. Indeed, we leave the LSC program subject to even a greater uncertainty than the one we purport to have eliminated, since other circuits may conclude (as I do) that if the limitation upon welfare representation is unconstitutional, LSC attorneys cannot engage in welfare litigation at all.

"The inquiry into whether a statute is severable is essentially an inquiry into legislative intent." *Minnesota* v. *Mille Lacs Band of Chippewa Indians,* 526 U. S. 172, 191 (1999). If Congress "would not have enacted those provisions which are within its power, independently of that which is not," then courts must strike the provisions as a piece. *Alaska Airlines, Inc.* v. *Brock,* 480 U. S. 678, 684 (1987) (internal quotation marks omitted). One determines what Congress would have done by examining what it did. Perhaps the most that can be said on the subject is contained in a passage written by Chief Justice Shaw of the Supreme Judicial Court of Massachusetts that we have often quoted:

> "[I]f [a statute's provisions] are so mutually connected with and dependent on each other, as conditions, considerations or compensations for each other, as to warrant a belief that the legislature intended them as a whole, and that, if all could not be carried into effect, the legislature would *not* pass the residue independently, and some parts are unconstitutional, all the provisions which as thus dependent, conditional or connected, must fall with them." *Warren* v. *Mayor and Aldermen of Charlestown,* 68 Mass. 84, 99 (1854).

It is clear to me that the LSC Act's funding of welfare benefits suits and its prohibition on suits challenging or defending the validity of existing law are "conditions, considerations [and] compensations for each other" that cannot be severed. Congress through the LSC Act intended "to provide high quality legal assistance to those who would be otherwise unable to afford adequate legal counsel," 42 U. S. C. § 2996(2), but only if the program could at the same time "be kept free from the influence of or use by it of political pressures," § 2996(5). More than a dozen times in § 504(a) Congress made the decision that certain activities could not be funded *at all* without crippling the LSC program with political pressures. See, *e. g.,* § 504(a)(1) (reapportionment

litigation); § 504(a)(4) (local, state, and federal lobbying); § 504(a)(7) (class-action lawsuits); § 504(a)(12) (training programs for, *inter alia*, boycotts, picketing, and demonstrations); § 504(a)(14) (litigation with respect to abortion). The severability question here is, essentially, whether, without the restriction that the Court today invalidates, the permission for conducting welfare litigation would have been accorded. As far as appears from the best evidence (which is the structure of the statute), I think the answer must be no.

We have in some cases stated that when an "excepting proviso is found unconstitutional the substantive provisions which it qualifies cannot stand," for "to hold otherwise would be to extend the scope of the law . . . so as to embrace [situations] which the legislature passing the statute had, by its very terms, expressly excluded." *Frost* v. *Corporation Comm'n of Okla.*, 278 U. S. 515, 525 (1929); see also *Davis* v. *Wallace*, 257 U. S. 478, 484 (1922) ("Where an excepting provision in a statute is found unconstitutional, courts very generally hold that this does not work an enlargement of the scope or operation of other provisions with which that provision was enacted, and which it was intended to qualify or restrain"). I frankly doubt whether this approach has been followed consistently enough to be called the "general" rule, but if there were ever an instance in which it is appropriate it is here. To strike the restriction on welfare benefits suits is to void § 504(a)(16) altogether. Subsection (a)(16) prohibits involvement in three types of activities with respect to welfare reform: lobbying, rulemaking, and litigation. But the proscriptions against using LSC funds to participate in welfare lobbying and rulemaking are superfluous, since as described above subsections (a)(2), (a)(3), and (a)(4) of § 504 withhold LSC funds from those activities generally. What is unique about subsection (a)(16)—the only thing it achieves—is its limit on litigation. To remove that limit is to repeal subsection (a)(16) altogether, and thus to eliminate a significant *quid pro quo* of the legislative compromise. We

have no authority to "rewrite [the] statute and give it an effect altogether different" from what Congress agreed to. *Railroad Retirement Bd.* v. *Alton R. Co.*, 295 U. S. 330, 362 (1935) (quoted in *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 313 (1936)).

\* \* \*

It is illuminating to speculate how these cases would have been decided if Congress had enacted § 504(a)(16) without its proviso (prescribing only the general ban against "litigation, lobbying, or rulemaking, involving an effort to reform a Federal or State welfare system"), and if the positions of the parties before us here were reversed. If the LSC-funded lawyers were here arguing that the statute permitted representation of individual welfare claimants who did not challenge existing law, I venture to say that the Court would endorse their argument—perhaps with stirring language about the importance of aid to welfare applicants and the Court's unwillingness to presume without clear indication that Congress would want to eliminate it. And I have little doubt that in that context the Court would find its current First Amendment musings as unpersuasive as I find them today.

Today's decision is quite simply inexplicable on the basis of our prior law. The only difference between *Rust* and the present cases is that the former involved "distortion" of (that is to say, refusal to subsidize) the normal work of doctors, and the latter involves "distortion" of (that is to say, refusal to subsidize) the normal work of lawyers. The Court's decision displays not only an improper special solicitude for our own profession; it also displays, I think, the very fondness for "reform through the courts"—the making of innumerable social judgments through judge-pronounced constitutional imperatives—that prompted Congress to restrict publicly funded litigation of this sort. The Court says today, through an unprecedented (and indeed previously rejected) interpretation of the First Amendment, that we will not allow this

restriction—and then, to add insult to injury, permits to stand a judgment that awards the general litigation funding that the statute does not contain.   I respectfully dissent.