**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number: 2012-NMSC-011**

**Filing Date: April 12, 2012**

**Docket No. 32,400**

**DENNIS W. MONTOYA**,

> **Plaintiff-Appellant,**

**v.**

**MARY HERRERA, Secretary
of State, State of New Mexico,**

> **Defendant-Appellee,**

**and**

**HON. LINDA M. VANZI,**

> **Intervenor.**

**ORIGINAL PROCEEDING**

The Hammel Law Firm, P.C.
Hazen H. Hammel
Albuquerque, NM

for Appellant

Gary K. King, Attorney General
Scott Fuqua, Assistant Attorney General
Santa Fe, NM

for Appellee

Garcia & Vargas, L.L.C.
Ray M. Vargas, II
Santa Fe, NM

for Intervenor

**OPINION**

**PER CURIAM.**

**{1}** Before the 2010 primary election, this Court was called upon to decide whether Dennis Montoya (Appellant), a candidate for a Court of Appeals judgeship, was properly disqualified by the Secretary of State (the Secretary) from receiving public campaign funding under the New Mexico Voter Action Act (the Act). In this, our first opportunity to construe the Act, we explain our previous oral ruling affirming the Secretary, and we address Appellant's constitutional challenges to the Act as well as the civil penalty the Secretary imposed upon him.

**BACKGROUND**

**{2}** During the 2010 primary election cycle, Appellant filed a declaration of intent to seek public funding for his judicial campaign and subsequently filed with the Secretary an application for certification to begin receiving public funds. Thereafter, the Secretary informed Appellant by letter that he was not qualified to receive public funding because he had violated the Act's contribution limits and reporting requirements. In particular, the Secretary declined to certify Appellant because he had exceeded the Act's $5000 limit for seed money contributions, spent more than $500 on his campaign before declaring his intent to seek public campaign financing, and violated the Secretary's seed money reporting requirements. Appellant requested an administrative review of the Secretary's decision. The administrative hearing officer ultimately recommended upholding the Secretary's decision on two of the three grounds—that Appellant had exceeded the Act's seed money contribution limits and that he had failed to comply with the Secretary's reporting requirements.[1] The Secretary adopted the hearing officer's recommendation and declined to reverse her prior refusal to certify Appellant.

**{3}** Appellant appealed to the district court and also filed an original action in that court for declaratory and injunctive relief. Appellant focused his challenge on the Secretary's determination that he exceeded the $5000 seed money contribution limit required by the Act. Appellant also argued that the Secretary's interpretation of the Act violated his First Amendment rights. While the appeal was pending in district court, the Secretary imposed a $2000 civil penalty against Appellant. The district court upheld the Secretary's decision, and Appellant sought further review in the Court of Appeals. Because Appellant was running for election against a sitting member of the Court of Appeals, the appeal was transferred to this Court for a final determination before the impending primary election. Our order following an expedited proceeding affirmed the district court and ruled that the Secretary correctly disqualified Appellant from receiving public financing under the Act.

---

[1]The failure to report the names and addresses of seed money donors was not challenged on appeal and will not be addressed in this opinion.

In so doing, we rejected Appellant's constitutional challenges to the Secretary's application of the Act. However, we took under advisement the Secretary's imposition of the $2000 civil penalty against Appellant and asked the parties to file supplemental briefs before making a final decision on that issue. We explain our May 24, 2010 order and address the civil penalty in this Opinion.

**DISCUSSION**

**Standard of Review**

**{4}** This case presents questions of statutory interpretation which we review de novo. *See Cobb v. State Canvassing Bd.*, 2006-NMSC-034, ¶ 33, 140 N.M. 77, 140 P.3d 498. To the extent that Appellant's constitutional arguments are considered, they too are reviewed de novo. *See State ex rel. New Mexico Judicial Standards Comm'n v. Espinosa*, 2003-NMSC-017, ¶ 5, 134 N.M. 59, 73 P.3d 197.

**The Voter Action Act**

**{5}** New Mexico is one of a number of states that provide public campaign financing for certain elective offices. In 2003, our Legislature adopted the Act to provide public funding of campaigns for the office of public regulation commissioner. *See* NMSA 1978, §§ 1-19A-1 to -17 (2003, as amended through 2007). In 2007, the Legislature expanded the Act to encompass the statewide judicial offices of Court of Appeals judge and Supreme Court justice. *See* § 1-19A-2(D) (amending the definition of "covered office" to include "any office of the judicial department subject to statewide elections").

**{6}** Under the Act, a candidate seeking one of the covered offices initiates the public financing process by filing a declaration of intent with the Secretary. *See* § 1-19A-3(A). By filing the declaration of intent, the candidate becomes known as an "applicant candidate" under the Act. See §§ 1-19A-2(A), -3(A). The declaration of intent must explicitly confirm the candidate's past and future compliance with all contribution and expenditure limits and other requirements under the Act. *See* § 1-19A-3(B). The candidate must file the declaration of intent before or during what is known under the Act as the "qualifying period." Section 1-19A-3(A). For major party candidates, which Appellant was, the qualifying period begins on October 1 of the year preceding the election year and ends on the third Tuesday of March of the election year. *See* § 1-19A-2(I)(1). If a candidate has accepted contributions or made expenditures totaling $500 or more between the beginning of the qualifying period and filing the declaration of intent, that candidate is *not* eligible to become an applicant candidate for public financing under the Act. *See* § 1-19A-3(C).

**{7}** After filing the declaration of intent, an eligible applicant candidate may begin accepting "qualifying contributions" under the Act. *See* § 1-19A-3(B). Qualifying contributions are individual $5.00 donations made during the qualifying period in support of the applicant candidate by registered voters who are eligible to vote for the office the

3

applicant candidate is seeking. *See* § 1-19A-2(H)(1) & (2). To become certified for public financing, the applicant candidate must obtain a minimum number of qualifying contributions, among other conditions. *See* § 1-19A-4(A)(1) (setting the requisite number of qualifying contributions for statewide judicial elective offices as one-tenth of one percent of the number of voters in the state); *see also* § 1-19A-6 (providing the requirements for becoming a certified candidate).

{8} In addition to collecting qualifying $5.00 contributions, an applicant candidate may collect what is known under the Act as "seed money." Section 1-19A-5(A). The Act defines "seed money" as "a contribution raised for the primary purpose of enabling applicant candidates to collect qualifying contributions and petition signatures." Section 1-19A-2(K). In collecting seed money, an applicant candidate is limited to no more than $100 per donor and no more than $5000 in total donations; the applicant candidate may use personal funds for seed money but no more than the $5000 limit. *See* § 1-19A-5(A) & (H). Before being certified, "an applicant candidate shall not accept contributions, except for seed money or [the $5.00] qualifying contributions." Section 1-19A-5(F).

{9} To become a certified candidate entitled to receive public funds, the Secretary must determine that the applicant candidate has (1) filed a declaration of intent to obtain public financing under the Act, (2) submitted the requisite number of qualifying $5.00 contributions, (3) qualified as a candidate for office under state election law, (4) complied with restrictions on seed money contributions and expenditures, and (5) otherwise satisfied the requirements for obtaining public financing under the Act. Section 1-19A-6(A) & (B). In a primary election, a candidate certified for a contested statewide judicial office is entitled to an initial disbursement from the public election fund equal to "15 cents ($.15) for each voter of the candidate's party in the state." Section 1-19A-13(B)(2). If the primary election is uncontested, a certified candidate receives half that amount. Section 1-19A-13(C). If the certified candidate wins the primary election, the judicial candidate receives another disbursement from the public election fund for the general election equal to 15 cents per voter in the state. Section 1-19A-13(D)(2). In no event may the certified candidate's total campaign expenditures and debts exceed the amount of money distributed from the public election fund, and the certified candidate may not accept contributions or loans from any other source except the candidate's political party. *See* § 1-19A-7(C).

**The Act limits all contributions from an Applicant Candidate's own funds to the $5000 seed money limit in Section 1-19A-5(A).**

{10} The dispute in this case centers on the provision in Section 1-19A-5(A), that "[a]n applicant candidate may contribute an amount of seed money from the applicant candidate's own funds up to" the $5000 limit. *See also* § 1-19A-5(H) (providing that applicant candidates "shall limit seed money contributions and expenditures to five thousand dollars"). Exceeding this limit, Appellant contributed at least $8887.29 to his campaign during the qualifying period when the limit applied. Attempting to avoid the $5000 seed money limitation, Appellant argued to the Secretary that his contribution in excess of $5000 was not

4

used for "seed money purposes" but rather for "general campaign expenditures" that did not count toward the limit. We reject Appellant's argument for several reasons.

**{11}** First, that distinction is simply not in the Act. Nowhere does the Act distinguish between contributions and expenditures for "seed money" and contributions and expenditures for "general campaign expenditures." We will not read such language into the Act, nor would it make sense to do so. *See State v. Nick R.*, 2009-NMSC-050, ¶ 11, 147 N.M. 182, 218 P.3d 868 ("We must take care to avoid adoption of a construction that would render the statute's application absurd or unreasonable or lead to injustice or contradiction." (Internal quotation marks and citation omitted.)); *High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶ 5, 126 N.M. 413, 970 P.2d 599 (noting that we will not read into a statute language which is not there, particularly if it makes sense as written).

**{12}** Trying to read the distinction into the Act, Appellant argues that his "general" contributions were intended to cover other kinds of expenses such as the costs of seeking his party's support at local preprimary convention gatherings leading up to the state preprimary convention. As such, his argument goes, these contributions were not intended to pay for the kinds of expenses that seed money is intended to cover and to limit. *See* § 1-19A-2(K) (defining "seed money" as "a contribution raised for the *primary purpose* of enabling applicant candidates to collect qualifying contributions and petition signatures" (emphasis added)). Being for a different purpose, Appellant's self-funded contributions for general expenditures should not be subject to the limitations for seed money, Appellant contends.

**{13}** We turn again to the language in the Act. Not only is such a distinction absent from its text, but the intended scope of seed money is not so limited as Appellant would have us believe. The definition of seed money, quoted above from Section 1-19A-2(K), extends beyond just collecting qualifying $5.00 contributions and petition signatures as long as that is its "primary purpose." Recognizing that seed money could be used for other purposes, the Legislature surely intended that its limitations would apply equally to those other purposes, thereby anticipating the very kind of semantic distinctions that Appellant proposes in this case. *See Key v. Chrysler Motors Corp.*, 121 N.M. 764, 768-69, 918 P.2d 350, 354-55 (1996) ("In interpreting statutes, we seek to give effect to the Legislature's intent, and in determining intent we look to the language used and consider the statute's history and background.").

**{14}** Our conclusion is buttressed by the legislative mandate, elsewhere in the Act, that during the qualifying period "an applicant shall not accept contributions, except for seed money or qualifying contributions." Section 1-19A-5(F). The Act also states that "[a]n applicant candidate may *contribute* an amount of seed money from the applicant candidate's own funds . . . ." Section 1-19A-5(A) (emphasis added). The text of the Act makes our conclusion inescapable: an applicant candidate's personal expenditures on a campaign are considered "contributions" under the Act, subject to the $5000 limit, regardless of how the candidate may characterize those funds or their intended use.

**{15}**     As the Secretary emphasizes, and the district court rightly recognized, the Act could easily become unworkable if an applicant candidate were allowed to circumvent the seed money contribution limit by labeling contributions as intended for "general expenditures." As the Secretary posits, if the candidate spent $6000 of his own funds on an event to (1) solicit party support for the pre-primary nominating convention, *and* (2) collect qualifying contributions in the process, how much of that $6000 was the seed money expenditure?  Or if the candidate were to spend his own money on a direct mail or telephone campaign, soliciting support from members of the political party's central committee *and* soliciting qualifying contributions, what fraction of that expense would be seed money?  How would the Secretary make these determinations and according to what criteria?  We could envision a host of other realistic scenarios that would all call into question the feasibility and legitimacy of Appellant's proposal to characterize campaign expenditures.

**{16}**     We agree with the Secretary's observation that the process of collecting qualifying contributions and petition signatures is far too intertwined with other campaign activities to draw such a fine line.  As this case illustrates, any attempt to do so would prove difficult to administer and susceptible to abuse.  In short, when Appellant contributed more than $8000 of his own money to the campaign, while simultaneously applying for public funds, he violated the Act.  Under the law, the Secretary had no choice but to disqualify him from public financing, and she did so.

**The Act's limitation on the amount of money that may be contributed from an applicant candidate's own funds does not violate constitutional rights to free speech.**

**{17}**     Because the Act limits the amount of money that a candidate may contribute from the candidate's own funds, Appellant claims the Act unconstitutionally burdens his First Amendment right to free speech.  In this regard, Appellant makes much of the United States Supreme Court's recent opinion in *Citizens United v. Fed. Election Comm'n*, 130 S.Ct. 876, 898 (2010), which equates campaign contributions with speech, subjecting any government infringement on the free exercise of that right to strict scrutiny.  In contrast, the Secretary argues that the Act is simply a state election law that seeks to establish a fair and efficient method for regulating some of this state's elections.  And as such, the Secretary maintains the Act must only withstand a less rigorous balancing test first enunciated by the United States Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).  We need not decide, however, which test applies to Appellant's constitutional challenge because Appellant voluntarily chose to apply for public financing under the Act and agreed to its terms.  *See See Buckley v. Valeo*, 424 U.S. 1, 57 n.65 (1976) (per curiam) ("[Government] may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations.").

**{18}**     The Act's public funding system is a voluntary one.  A candidate for one of the covered offices may seek public funding under the Act, but is not required to do so.  If the candidate chooses not to seek public financing, the Act does not impose any restriction on

6

that candidate's contributions or expenditures, including self-financing.

**{19}** Instead, Appellant chose to limit the amount of his personal finances he could expend on his campaign when he filed his declaration of intent under the Act, and Appellant never claimed that his choice was anything but voluntary. *See, e.g.*, *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 739 (2008) (distinguishing an involuntary limit on personal expenditures from a voluntary limit imposed as a condition of public campaign financing); *Daggett v. Comm'n on Governmental Ethics & Election Practices*, 205 F.3d 445, 467 (1st Cir. 2000) ("[T]he appropriate benchmark of whether candidates' First Amendment rights are burdened by a public funding system is whether the system allows candidates to make a 'voluntary' choice about whether to pursue public funding." (citation omitted)); *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1552 (8th Cir. 1996) (providing that a public campaign finance system that is voluntary promotes rather than infringes on First Amendments rights). Accordingly, we need not address Appellant's constitutional challenges to a system that he voluntarily chose to join and could have chosen to avoid altogether.

**The Secretary was required under the Act to impose a civil penalty against Appellant for violating the Act.**

**{20}** In addition to disqualifying Appellant from receiving public funding under the Act, the Secretary subsequently imposed a $2000 civil penalty on Appellant for his violations of the Act. Under Section 1-19A-17(A), "a person who violates a provision of the [Act] is subject to a civil penalty of up to ten thousand dollars ($10,000) per violation." As discussed above, the record supported the Secretary's determination that Appellant violated the Act. Under the Act, the Secretary could have referred the matter to the attorney general for possible criminal prosecution but elected, in her discretion, not to do so. The imposition of a civil penalty is statutorily mandated because when "the secretary makes a determination that a violation of [the Act] has occurred, the secretary shall impose a fine or transmit the finding to the attorney general for prosecution." Section 1-19A-17(A); *see also* NMSA 1978, § 1-1-3 (1969) (explaining that "[a]s used in the election code 'shall' is mandatory").

**{21}** We acknowledge that our Court of Appeals recently held that the options of a civil penalty imposed by the Secretary and criminal prosecution by the attorney general are not mutually exclusive. *See State v. Block*, 2011-NMCA-101, ¶ 23, 150 N.M. 598, 263 P.3d 940. In *Block*, the Court of Appeals explained that a criminal prosecution could go forward even though the Secretary had already imposed a civil penalty. *Id.* ¶¶ 18-23. Here, the record indicates that the Secretary did not refer Appellant to the attorney general for possible criminal prosecution. Accordingly, the Secretary was statutorily obligated to impose a civil penalty under the Act. *See* § 1-19A-17(A). We conclude that the Secretary had discretion only to determine the amount of the penalty. *See id.*

**{22}** Despite the language of Section 1-19A-17, Appellant challenges the civil penalty on three grounds. First, Appellant claims the civil penalty was an unconstitutional infringement on his right to free speech. In essence, Appellant simply reiterates his constitutional

7

challenge to the Secretary's decision to disqualify him from public funding under the Act. Appellant's arguments in this regard are unpersuasive for the reasons discussed above. Appellant chose to subject himself to the Act and cannot simply accept its benefits and exempt himself from the mandatory civil penalties that he knew would be imposed for violations of the Act.

**{23}** Next, Appellant misplaces his reliance on a number of federal cases to suggest that a civil penalty cannot be imposed on him for voluntarily exercising his First Amendment right to free speech. In those federal cases, the United States Supreme Court reversed the denial of access to government benefits that was based on the content of the person's speech. *See, e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 835-37 (2003) (holding that state university guidelines which denied student activity fund support to the student newspaper on the basis of religious content violated the First Amendment right to free speech); *Legal Servs. Corp. v. Velasquez*, 531 U.S. 533, 537 (2001) (holding that restrictions which prohibited Legal Services Corporation's funding of any organization representing clients who challenge existing welfare law violated the First Amendment right to free speech). In contrast, the Act's restrictions on the amount of money a candidate may contribute to his own campaign is completely unrelated to the content of the candidate's speech. The Act's restriction on campaign contributions is not a method for restricting speech nor is Appellant's civil penalty a restriction of his speech.

**{24}** Appellant finally contends that a civil penalty was inappropriate in this case because there was no evidence of misconduct on his part, let alone willful misconduct. Appellant's argument ignores the plain language of the statute. A willful or knowing violation is required for *criminal* sanctions under the Act, but the Secretary is authorized to institute a *civil* penalty for any "person who violates [the Act]." *Compare* § 1-19A-17(A) *with* § 1-19A-17(B). Our Court of Appeals recently recognized that a showing of scienter is not necessary to support the imposition of a civil penalty. *See Block*, 2011-NMCA-101, ¶ 40. Accordingly, a violation of the Act is all that is required for the Secretary to fine the violator.

**{25}** The extent to which Appellant did or did not intend to violate the Act has no bearing on whether the Secretary should impose a civil penalty, though such questions would undoubtedly play a role in the amount of the civil penalty that the Secretary decides to impose. And to the extent that Appellant seeks to equate a civil penalty under Section 1-19A-17(A) with a Rule 1-011 NMRA penalty for which a showing of willful misconduct is required, we simply note that the requirements of Rule 1-011 have no bearing on what Appellant was prohibited from doing under the Act. We find no basis for concluding that the Secretary erred by imposing a civil penalty against Appellant for exceeding seed money contribution limits and failing to comply with the Act's reporting requirements. We therefore affirm the district court's decision to uphold the Secretary's imposition of the $2000 civil penalty against Appellant. Accordingly, we hereby hold that (1) the Secretary properly disqualified Appellant, (2) the Act and the Secretary's actions are not subject to Appellant's constitutional challenge, and (3) the civil penalty imposed on Appellant is justified.

8

**CONCLUSION**

**{26}** The judgment of the district court is hereby affirmed.

**{27}** **IT IS SO ORDERED.**

                                   _____

                                   **PETRA JIMENEZ MAES, Chief Justice**

                                   _____

                                   **PATRICIO M. SERNA, Justice**

                                   _____

                                   **RICHARD C. BOSSON, Justice**

                                   _____

                                   **CHARLES W. DANIELS, Justice**

                                   **EDWARD L. CHÁVEZ (recused)**

**Topic Index for *Montoya v. Herrera*, Docket No. 32,400**

| | |
|---|---|
| **CT** | **CONSTITUTIONAL LAW** |
| CT-FS | Freedom of Speech |
| CT-WR | Waiver of Rights |
| | |
| **GV** | **GOVERNMENT** |
| GV-EL | Elections |
| GV-PF | Public Funds |
| | |
| **MS** | **MISCELLANEOUS STATUTES** |
| MS-VA | Voter Action Act |
| | |
| **ST** | **STATUTES** |
| ST-IP | Interpretation |
| ST-LI | Legislative Intent |