811 So.2d 644 (2002)
Mark Evan OLIVE, Appellant/Cross-Appellee,
v.
Roger MAAS, in His Official Capacity as Executive Director of the Commission on the Administration of Justice in Capital Cases, et al., Appellees/Cross-Appellants.
No. SC00-317.
Supreme Court of Florida.
February 14, 2002.
*646 Stephen F. Hanlon and Susan L. Kelsey of Holland & Knight, Tallahassee, FL; and Robert J. Shapiro of Holland & Knight, Tampa, FL, for Appellant/Cross-Appellee.
Michael Pearce Dodson, General Counsel, Office of Legislative Services, Tallahassee, FL; and Robert A. Butterworth, Attorney General, Carolyn M. Snurkowski, Assistant Deputy Attorney General, and Louis F. Hubener, Assistant Attorney General, for Appellees/Cross-Appellants.
Robert Augustus Harper of Robert Augustus Harper Law Firm, P.A., Tallahassee, FL, for Florida Association of Criminal Defense Lawyers, Amicus Curiae.
LEWIS, J.
We have for review a final judgment of a Leon County trial court certified by the First District Court of Appeal as being of great public importance and requiring immediate resolution by this Court. We have jurisdiction. See art. V, § 3(b)(5), Fla. Const.

FACTS
Mark Evan Olive is a Florida attorney who routinely represents defendants on death row in postconviction proceedings. Pursuant to section 27.710, Florida Statutes (Supp.1998), ("the Registry Act"), Olive sought appointment through the registry of attorneys who are available to represent defendants in postconviction capital collateral proceedings, and on September 1, 1998, Judge Donald R. Moran, Jr., Chief Judge of the Fourth Judicial Circuit, appointed Olive to represent death row defendant Anthony Mungin. On September 11, 1998, respondent Roger A. Maas, the Executive Director of the Commission on the Administration of Justice in Capital Cases, sent Olive the contract detailing the terms and conditions of appointment as counsel in postconviction capital collateral proceedings ("the contract"), pursuant to section 27.711, Florida Statutes (Supp.1998). On February 22, 1999, Olive, through counsel, informed Judge Moran that due to "ethical concerns" he would not sign the contract. The letter advised in pertinent part:
On my advice, Mr. Olive has not signed [the] contract with the Comptroller....
Presently, Mr. Mungin does not have counsel within the meaning of Rules 3.851 and 3.852, Florida Rules of Criminal Procedure, and Chapter 119, Florida Statutes (1998). While an order has been entered appointing Mr. Olive, he has not accepted that appointment by entering into the necessary contract with the Comptroller of his designee.
Shortly thereafter, on March 2, 1999, respondent Maas wrote to Judge Moran suggesting that another attorney be appointed to represent Anthony Mungin, and he provided a list to Judge Moran which did not include Mr. Olive's name. On March 11, 1999, Judge Moran revoked Mr. Olive's initial appointment, and indicated that he would appoint a different attorney to represent Mr. Mungin.
Olive filed an action for declaratory relief in circuit court wherein he sought "a determination of his legal rights and professional duties" under the Registry Act and the contract.[1] Olive's complaint named Mr. Maas, in his official capacity as Executive Director of the Commission on the Administration of Justice in Capital *647 Cases,[2] and Robert F. Milligan, in his official capacity as Comptroller, as respondents. Florida Attorney General Robert A. Butterworth exercised his prerogative to appear and be heard as a party respondent. See §§ 16.01(5), 86.091, Fla. Stat. (1997).
The complaint alleged that Olive was "in doubt about his legal rights, duties, status and other equitable and legal relations under the Registry Act and the Contract." Count I sought a declaration that "strict application of the fee and costs limits in the Registry Act and Contract unconstitutionally curtailed the trial court's inherent power to ensure adequate representation." That is, Olive sought a determination that the limits on compensable hours and costs imposed by section 27.711 were unconstitutional in that they "prohibited" him from requesting compensation for time spent and costs incurred in excess of pre-established limits. In count II, Olive asserted that various limitations imposed by section 27.711 and in the contract would compel him to violate the Rules of Professional Conduct. Finally, in count III, Olive complained that Maas had excluded him from the list of lawyers sent to Judge Moran after Olive declined to be limited by the terms of the form contract as proposed. Olive sought injunctive relief to prohibit Maas from excluding Olive in the future from the registry list of attorneys available to represent postconviction defendants.
Respondents filed motions to dismiss all counts of the amended complaint, and a memorandum of law asserting, inter alia, that Olive lacked standing to challenge the provisions of section 27.710, section 27.711, or the contract because "he had no contract, no client and no case to pursue." Respondents additionally maintained that the circuit court was without jurisdiction to render a declaratory judgment because the claims were entirely speculative and not based on a present controversy, and that a permanent injunction was unwarranted. The circuit court judge denied respondents' motions to dismiss.
Olive then filed a motion for summary judgment on each of the three counts in the complaint. Following respondents' objection to Olive's motion, and Respondents' own ore tenus motion for summary judgment on all counts, the trial court entered summary final judgment in favor of the respondents as to counts I and II. As to count III, however, the trial court granted Olive's motion for summary judgment, and entered judgment which permanently enjoined Maas from excluding Olive from the registry list of available attorneys.
Olive timely filed his notice of appeal seeking review of the summary final judgment entered in favor of the respondents as to counts I and II of the amended complaint. Respondents cross-appealed the trial court's final order, seeking review of the permanent injunction. On Olive's suggestion, the First District Court of Appeal certified this case to us as one presenting questions of great public importance and requiring immediate resolution.

ANALYSIS
On review, Olive asks us to determine whether the capped fee schedule in the standard contract is void because it interferes with a defendant's right to the *648 effective assistance of counsel (count I), and whether the contract is also void to the extent that it requires postconviction counsel to engage in what Olive terms to be "unethical" behavior (count II). Respondents/cross-appellants suggest that these issues need not be presently addressed because Olive lacks standing to seek, and the trial court jurisdiction to enter, a declaratory judgment as to these two counts. Specifically, respondents/appellees assert that Olive's claims rest entirely on speculative assertions and contingent events. We disagree.
Pursuant to chapter 86 of the Florida Statutes, a trial court:
[M]ay render declaratory judgments on the existence, or nonexistence:
(1) Of any immunity, power, privilege, or right; or
(2) Of any fact upon which the existence or nonexistence of such immunity, power, privilege, or right does or may depend, whether such immunity, power, privilege, or right now exists or will arise in the future.
§ 86.011, Fla Stat. (2000). Section 86.021, Florida Statutes (2000), further instructs:
Any person claiming to be interested or who may be in doubt about his or her rights under a ... contract ... or whose rights, status, or other equitable or legal relations are affected by a statute ... may have determined any question of construction or validity arising under such statute ... [or] contract ... and obtain a declaration of rights, status, or other equitable or legal relations thereunder.
Accordingly, we have noted in the past that "[t]he purpose of a declaratory judgment is to afford parties relief from insecurity and uncertainty with respect to rights, status, and other equitable or legal relations." Santa Rosa County v. Administration Commission, 661 So.2d 1190,1192 (Fla.1995). Given the repeated adherence by Florida courts to the notion that the declaratory judgment statute should be liberally construed,[3] we conclude that Olive had standing to seek, and the trial court jurisdiction to enter, declaratory relief as to counts I and II.
The notion of a broad construction of the Declaratory Judgment Act was aptly stated in X Corp. v. Y Person, 622 So.2d 1098 (Fla. 2d DCA 1993), where the district court reasoned:
The goals of the Declaratory Judgment Act are to relieve litigants of the common law rule that a declaration of rights cannot be adjudicated unless a right has been violated and to render practical help in ending controversies which have not reached the stage where other legal relief is immediately available. To operate within this sphere of anticipatory and preventive justice, the Declaratory Judgment Act should be liberally construed.
Id. at 1100 (citation omitted).
Particularly instructive on the issues of jurisdiction and standing, given the facts in this case, is our previous decision in Holley v. Adams, 238 So.2d 401 (Fla.1970). In that case, Holley, a circuit court judge, intended to become a candidate for nomination and election to the office of Justice of the Supreme Court of Florida. Having declared his intention to run, he was faced with the "resign to run" provision of the Florida Statutes. Wishing to not resign from his position as a circuit court judge unless he was successful in his quest to become a justice of this Court, he sought a *649 declaration, pursuant to chapter 86, that the "resign to run" provision was unconstitutional. The trial court exercised its jurisdiction and declared the provision constitutional.
On appeal, the secretary of state maintained that the declaratory judgment should have never been entered in the first place because Holley was simply seeking an advisory opinion. The secretary of state suggested that Holley was not entitled to relief pursuant to the Court's prior decision in Bryant v. Gray, 70 So.2d 581 (Fla.1954). In Bryant, the petitioner had filed a complaint seeking a declaratory judgment as to the constitutionality of a provision declaring the governor ineligible for re-election for the next succeeding term. The complaint alleged that Bryant, who "desired" to serve the balance of the unexpired term of deceased Governor McCarty, also "desired" to become a candidate for the next succeeding term. Bryant sought the declaration because he reasoned that if he ran for the unexpired term and then found himself precluded from running for the succeeding full term, he might not want to run for the unexpired term. Bryant never alleged that he would become a candidate for the unexpired term or full term. The Court concluded that the trial court was without jurisdiction because the question which Bryant presented was "hypothetical and too remote as to time and too uncertain as to contingencies" to warrant declaratory relief. Id. at 584.
The Holley Court found Bryant distinguishable and the secretary of state's argument unpersuasive. Particularly, the Court noted that Holley had publicly announced his intention to become a candidate, that he had filed with the Secretary of State a declaration of such intention, and that he had designated a campaign treasurer as well as a depository for campaign funds. The Court concluded that Holley's request for a declaratory judgment was not too hypothetical or remote, and that "the fact that a controversy had not matured is not always essential." Holley, 238 So.2d at 404 (citing James v. Golson, 92 So.2d 180 (Fla.1957)). Ultimately, the Court determined that the circuit court appropriately exercised its declaratory judgment jurisdiction.
The instant case presents a situation similar to that reviewed in Holley.[4] Although it is true that Olive never actually signed the contract, he requested that he be placed on the registry, accomplished all the necessary steps to be placed on the list, and was in fact included on the list. Olive was appointed to provide representation and began performing his duties as counsel to Mr. Mungin, even initiating a meeting with the client. It was then demanded that he execute a standard contract that contained the provisions which Olive has challenged in this action. Olive never declined his appointment to represent Mungin; he simply brought the legal issues associated with the contract to the attention of the trial court. At the time the trial court removed him as counsel, Olive was attempting to both represent Mr. Mungin and to resolve the serious legal issues presented by the contract submitted to him by Mr. Maas at the same time. To say that Olive, a registry attorney, who simply stopped short of signing the contract, lacks standing to seek a declaratory judgment is to narrow the proper *650 interpretation which has been consistently given to the Declaratory Judgment Act.[5] Given his status as a registry attorney, his appointment, the demand for execution of the objectionable form contract,[6] and the need for expeditious resolution of the issues raised in the complaint below, we conclude that the trial court did not step beyond its jurisdiction in entering declaratory relief as to counts I and II. See, e.g., Travelers Ins. Co. v. Emery, 579 So.2d 798, 800 (Fla. 1st DCA 1991) (concluding that a trial court's decision to grant declaratory relief should be accorded great deference); Kelner v. Woody, 399 So.2d 35, 37 (Fla. 3d DCA 1981) (same). We now proceed to analyze the substance of the claims presented.

Capped Fee Schedule
In 1998, the Legislature enacted sections 27.710 and 27.711 which, as previously explained, provide for the maintenance of a registry of private attorneys to represent indigent death row defendants in postconviction proceedings, and establish the fee schedule and other guidelines which must be adhered to by these private attorneys, respectively. The purpose of this program was to "alleviate ... CCRC's backload of capital cases which have not been assigned to an attorney." Fla. S. Comm. on Crim. Just., CS for SB 1328 Staff Analysis 1 (Mar. 3, 1998) (on file with comm.).
Of particular contention in this case is the language in section 27.711(3), which dictates that "[t]he fee and payment schedule in this section is the exclusive means of compensating a court-appointed attorney who represents a capital defendant." (Emphasis supplied.) The fee schedule is in turn set forth in subsection (4).[7] The *651 contract which the registry attorneys must sign upon appointment tracks the language in section 27.711(3)-(4), and incorporates the entire compensation scheme by reference. Thus, both the contract and the statutory language indicate that the compensation scheme outlined in the legislation constitutes the exclusive means of compensation. Olive's particular contention is that by agreeing that the fees and costs schedule established in section 27.711 encompasses the exclusive means of compensation, he would be waiving any further compensation to which he may be entitled.
His concern is based on a series of cases from this Court which, in short, provide that statutory maximum fees may be unconstitutional when they are inflexibly imposed in cases involving unusual or extraordinary circumstances because these caps interfere with the trial court's inherent power to ensure adequate representation and the defendant's Sixth Amendment right to assistance of counsel. See Makemson v. Martin County, 491 So.2d 1109 (Fla.1986); see also White v. Board of County Commissioners of Pinellas County, 537 So.2d 1376 (Fla.1989). For example, in Makemson, the Court addressed the constitutionality of section 925.036, Florida Statutes (1981), setting fee caps on compensation provided to attorneys who represented defendants at trial and first appeal as a matter of right. The Court held that, although the statute was not unconstitutional on its face, the statute was *652 "unconstitutional when applied in such a manner as to curtail the court's inherent power to ensure the adequate representation of the criminally accused." Makemson, 491 So.2d at 1112. The opinion added:
[I]t is within the inherent power of Florida's trial courts to allow, in extraordinary and unusual cases, departure from the statute's fee guidelines when necessary in order to ensure that an attorney who has served the public by defending the accused is not compensated in an amount which is confiscatory of his or her time, energy and talents.
Id. at 1115. The Makemson Court also focused greatly on a defendant's constitutional right to the effective assistance of counsel, reasoning:
Most fundamentally ... [a mandatory fee cap] interferes with the sixth amendment right to counsel. In interpreting applicable precedent and surveying the questions raised in the case, we must not lose sight of the fact that it is the defendant's right to effective representation rather than the attorney's right to fair compensation which is our focus. We find the two inextricably intertwined.
Id. at 1112. Overall, the Makemson decision strongly suggests that a mandatory fee cap interferes with the right to counsel in that:
(1) It creates and economic disincentive for appointed counsel to spend more than a minimum amount of time on the case; and (2) It discourages competent attorneys from agreeing to a court appointment, thereby diminishing the pool of experienced talent available to the trial court.
Bottoson v. State, 674 So.2d 621, 626 (Fla. 1996) (Kogan, J., concurring in part and dissenting in part).
Subsequent to the Makemson decision, we decided White wherein we further elucidated:
We find that all capital cases by their very nature can be considered extraordinary and unusual and arguably justify an award of attorney's fees in excess of the current statutory fee cap.
537 So.2d at 1378. On the issue of the relationship between attorney compensation and a defendant's right to counsel, we noted:
It must be remembered that an indigent defendant's right to competent and effective representation, not the attorney's right to reasonable compensation, gives rise to the necessity of exceeding the statutory maximum fee cap. The relationship between an attorney's compensation and the quality of his or her representation cannot be ignored. It may be difficult for an attorney to disregard that he or she may not be reasonably compensated for the legal services provided due to the statutory fee limit. As a result, there is a risk that the attorney may spend fewer hours than required representing the defendant or may prematurely accept a negotiated plea that is not in the best interests of the defendant. A spectre is then raised that the defendant received less than the adequate, effective representation to which he or she is entitled, the very injustice appointed counsel was intended to remedy.
Id. at 1179-80.
The year after White was released, we decided Remeta v. State, 559 So.2d 1132 (Fla.1990), where we extended the reasoning of Makemson and White to a case involving the statutory right to counsel, as opposed to a constitutional right to counsel. In that case, a private attorney was appointed to represent Remeta at his executive clemency proceeding. After the representation, the attorney sought fees in *653 excess of those delineated by statute. See § 925.035(4), Fla. Stat. (1987). On appeal, the State argued that, "[s]ince Makemson and White establish rules to protect the constitutional right to effective assistance of counsel ... neither case applies here because there is no such `right' at issue, constitutional or otherwise." Id. at 1134. The Court, in rejecting the State's argument, reasoned that "it is clear that this state has established a right to counsel in clemency proceedings for death penalty cases, and this statutory right necessarily carries with it the right to have effective assistance of counsel." Id. at 1135. We ultimately extended the rationale underlying Makemson and White, indicating:
The concerns we addressed in Makemson and White were to ensure effective assistance of counsel for indigent defendants through adequate compensation for time-consuming court-appointed public service, and to prevent confiscatory compensation of counsel. These concerns weigh just as heavily in executive clemency proceedings, especially where a defendant's life is at stake.
Id. We further noted:
The appointment of counsel in any setting would be meaningless without some assurance that counsel give effective representation. As we said is Makemson, our focus must be on the "defendant's right to effective representation rather than the attorney's right to fair compensation." Unfortunately, the "link between compensation and the quality of representation remains too clear."
Id. (quoting Makemson, 491 So.2d at 1114) (citation omitted) (alteration in original). It is on the foundation of these decisions that Olive asserts that he may not be "forced" to sign a contract waiving further potential compensation which exceeds the statutory fee cap.
Respondents/appellees candidly conceded during oral arguments that Makemson, White, and Remeta were applicable to the present case and that, accordingly, in capital cases where extraordinary or unusual circumstances exist, trial courts are authorized to award fees in excess of the statutory schedule set out in section 27.711(4). That Makemson and its progeny control this issue is expressly noted in a staff analysis forming part of the legislative history of section 27.711. Specifically, the Staff Analysis to SB 2054, which ultimately became chapter 99-221, Laws of Florida, amending sections 27.710 and 27.711, indicates the following under the heading "Other Constitutional Issues:"
Section 27.711(4), F.S., provides for the hourly rate and maximum compensation of registry attorneys. In Makemson v. Martin County, 491 So.2d 1109 (Fla.1986), the Florida Supreme Court held that a statute which set a maximum fee limitation for compensation to attorneys who were appointed by the court to represent indigent criminal defendants was constitutional, on its face. However, the Court stated that such a statute may be "unconstitutional when applied in such a manner as to curtail the court's inherent power to ensure the adequate representation of the criminally accused." Id. According to the Court, "statutory maximum fees, as inflexibly imposed in cases involving unusual or extraordinary circumstances, interfere with the defendant's sixth amendment right `to have the assistance of counsel for his defense.'" Id[.] (citation omitted).
Consequently, where unusual or extraordinary circumstances exist, the fees caps established by s.27.711(4), F.S., and increased by the provisions of this bill, do not prevent a court from ordering payment above the maximum authorized.
Fla. S. Comm. on Crim. Just., CS for SB 2054 Staff Analysis 7 (March 17, 1999) (on file with comm.) (emphasis supplied); see also Arvelaez v. Butterworth, 738 So.2d *654 326, 328 (Fla.1999) (Anstead, J., specially concurring) (discussing 1999 amendments to section 27.711 and noting that the "staff analyses from both the Senate and the House specifically indicate that the legislature is concerned about compliance with this Court's decision in Makemson."). Accordingly, although section 27.711 indicates that the fee schedule set forth in subsection (3) is the "exclusive means of compensation," the legislative history and staff analysis clearly contemplate, and indeed accommodate, fees in excess of the statutory schedule in cases where unusual or extraordinary circumstances exist. In doing so, it is obvious that the legislative process patently acknowledged that unless room is made to allow compensation in excess of the fee caps, a statutory framework may run afoul of this Court's precedent in Makemson and its progeny.
Thus, as to this issue, we conclude, consistent with Makemson, White, Remeta, the legislative history of section 27.711, and respondents/appellees' concessions, that trial courts are authorized to grant fees in excess of the statutory schedule where extraordinary or unusual circumstances exist in capital collateral cases. To be sure, by so concluding, we do not purport to hold that fees in excess of the statutory cap will always be awarded to registry attorneys in capital collateral cases. Obviously, the Makemson standard clearly envisions an "as applied" analysis. Instead, we simply hold that by accepting an appointment, a registry attorney is not forever foreclosed from seeking compensation should he or she establish that, given the facts and circumstances of a particular case, compensation within the statutory cap would be confiscatory of his or her time, energy and talent and violate the principles outlined in Makemson and its progeny.

Ethical Concerns
Olive next asserts that certain provisions of section 27.711 and the contract, on their face, would compel an appointed attorney to violate ethical duties with respect to the representation of a death row client. We find Olive's arguments unpersuasive.
First, we address the provisions in the statute which address repetitive, frivolous or successive claims.[8] Olive maintains that adhering to these provisions would cause him to violate the Rules of Professional Conduct. Specifically, Olive asserts that these "restrictions" would prohibit him from acting as a zealous advocate by, for example, preventing him from asserting a claim based on a change in the law applicable retroactively, or arguing for the expansion or modification of existing law. This contention lacks merit because the rules themselves prohibit a lawyer from asserting frivolous or successive claims. See Fla. R.Crim. P. 3.850; R. Regulating Fla. Bar 4-3.1. Moreover, the claims which he asserts he would be unable to present are not claims which would be deemed frivolous, successive or repetitive. Resultantly, this contention is wholly without merit.[9]
With respect to the provision directed to the scope of representation, Olive *655 again maintains that compliance therewith would trigger a violation of his ethical obligations as an advocate.[10] We have previously addressed and rejected a similar argument in State ex rel. Butterworth v. Kenny, 714 So.2d 404 (Fla.1998). In that case, we reviewed the attorney general's petition to prevent CCRC attorneys representing death row inmates from filing civil actions in federal court on behalf of their respective clients. In that case we ultimately concluded:
In creating CCRC and the right to representation for capital defendants in postconviction relief proceedings, the Florida legislature has made a choice, "based on difficult policy considerations and the allocation of scarce legal resources," to limit the representation of CCRC by (1) prohibiting that representation from extending to representation "during trials, resentencings, proceedings commenced under chapter 940, or civil litigation," § 27.7001 (emphasis added); and (2) providing that such representation shall be "for the sole purpose of instituting and prosecuting collateral actions challenging the legality of the judgment and sentence imposed." § 27.702(1) (emphasis added). In our view, the statute empowers CCRC with the authority to challenge the validity of a capital defendant's conviction and sentence only through traditional postconviction relief proceedings in criminal and quasi-criminal proceedings.
Kenny, 714 So.2d at 408. Because the Legislature created this registry of attorneys to alleviate CCRC's workload, it is clear that registry attorneys stand in a position similar to CCRC lawyers. It is further clear that the Legislature obviously sought to impose the same restrictions on the scope of representation by both types of capital collateral attorneys. Given our conclusions in Kenny (i.e., upholding the same restrictions on representation by CCRC), and taking into account that those same restrictions were imposed on registry attorneys by the Legislature, we find no compelling reason to reach a different result in this case. Thus, we uphold these restrictions on the scope of representation based on the reasoning in Kenny.
Finally, we address Olive's challenge to the provision of the contract dealing with access to records.[11] Olive suggests *656 that this proviso in the contract would force him to violate his clients' confidences by requiring him to turn over privileged or confidential documents. The contract clearly does not contemplate such result. Rather, this provision of the contract refers to public records "subject to" chapter 119, Florida Statutes (1987), and in Kight v. Dugger, 574 So.2d 1066, 1069 (1990), we squarely held that:
[F]iles in the possession of CCR in furtherance of its representation of an indigent client are not subject to public disclosure under chapter 119. To hold otherwise would subject the records of a defendant who is unable to retain private collateral representation to public disclosure while those of a defendant represented by private counsel would be immune from such disclosure.
We find no reason to not extend the holding and rationale in Kight to registry attorneys who stand in a corresponding position with CCR (currently CCRC) attorneys. This view was admitted by respondent Maas when he acknowledged that the public access provision of the contract is limited by our holding in Kight. See Answer Brief of Appellee at 18 n. 9. Thus, adopting the reasoning in Kight, and extending it to apply to registry attorneys, we conclude that files in the possession of registry attorneys in furtherance of their representation of indigent postconviction clients are similarly not subject to public disclosure pursuant to chapter 119.

Injunction
We next address whether the trial court erred in permanently enjoining Maas from removing Olive's name from the registry list (count III). We agree with Maas that the permanent injunction should be dissolved.
We reach this conclusion after carefully reviewing the chronology leading to the injunction. On February 26, 1999, Mr. Olive's attorney sent a letter to Judge Moran indicating that "[w]hile an order has been entered appointing Mr. Olive, he has not accepted that appointment by entering into the necessary contract." The letter further clarified that "Mr. Mungin does not have counsel." A copy of this letter was sent to respondent/appellee Maas. On March 2, 1999, Mr. Maas then sent Judge Moran a new list of registry attorneys available for appointment. The list did not include Mark Olive's name. Judge Moran revoked Mr. Olive's initial appointment, and appointed a new attorney for Mr. Mungin on March 11, 1999. Mr. Olive subsequently sought to permanently enjoin Mr. Maas from excluding his name from the registry list. The trial court granted the injunction and further indicated in its final order:
[R]egardless of whether [Olive] may or may not have been deleted from the list or registry of attorneys eligible for appointment under Sections 27.710 and 27.711, Florida Statutes, [Olive] is entitled not to be excluded from the list or registry, in any shape or form, sent to trial courts pursuant to those sections.
From this record, it is clear that the injunction was sought, and entered, on the basis that Mr. Olive's name was not included in the list provided to Judge Moran. However, Mr. Maas' act of excluding Mr. *657 Olive's name from the list sent to Judge Moran of the attorneys available to represent Anthony Mungin is entirely logical given Mr. Olive's representations to Judge Moran that he could not execute the proposed contract. As of October 19, 1999, Mr. Olive's name remained on the general registry list, and respondent Maas indicates in his filings to this Court that Mr. Olive is qualified to be on and is in fact on the registry, and that Mr. Olive's "inability to represent Mr. Mungin does not preclude him from further consideration by trial courts." Answer Brief of Appellee at 27. We accept this representation to us by officers of the Court that Mr. Maas did not, and does not, intend to exclude Mr. Olive from the registry list, and that such occurred only in the Mungin case based upon the letter from Olive's counsel. Accordingly, we remand to the trial court to dissolve the permanent injunction. See Daniels v. Bryson, 548 So.2d 679, 681 (Fla. 3d DCA 1989) ("Florida adheres to the rule that `an injunction will not be granted where it appears that the acts complained of have already been committed and there is no showing by the pleadings and proof that there is a reasonably well grounded probability that such course of conduct will continue in the future.'") (quoting City of Jacksonville v. Wilson, 157 Fla. 838, 27 So.2d 108, 111 (1946)); see also Leach-Wells v. City of Bradenton, 734 So.2d 1168, 1171 (Fla. 2d DCA 1999).
It is so ordered.
SHAW, ANSTEAD, and PARIENTE, JJ., concur.
HARDING, J., dissents with an opinion, in which WELLS, C.J., and QUINCE, J., concur.
HARDING, J., dissenting.
I dissent because Olive does not have standing to bring a declaratory judgment action in this case. Olive, unlike the many registry attorneys who have accepted appointment, may never represent a capital defendant pursuant to the provisions of section 27.711. What Olive seeks, and this Court has no jurisdiction to render, is an advisory opinion.[12]
The majority cites several district court cases for the proposition that the declaratory judgment statute should be liberally construed, however, we have said:
Even though the legislature has expressed its intent that the declaratory judgment act should be broadly construed, there still must exist some justiciable controversy between adverse parties that needs to be resolved for a court to exercise its jurisdiction. Otherwise, any opinion would be advisory only and improperly considered in a declaratory action.
Martinez v. Scanlan, 582 So.2d 1167, 1170-71 (Fla.1991) (citations omitted).
In Martinez, we also noted that individuals who seek declaratory relief must establish that:
[T]here is a bona fide, actual, present practical need for the declaration; that the declaration should deal with a present, ascertained or ascertainable state of facts or present controversy as to a state *658 of facts; that some immunity, power, privilege or right of the complaining party is dependent upon the facts or the law applicable to the facts; that there is some person or persons who have, or reasonably may have an actual, present, adverse and antagonistic interest in the subject matter, either in fact or law; that the antagonistic and adverse interest [sic] are all before the court by proper process or class representation and that the relief sought is not merely the giving of legal advice by the courts or the answer to questions propounded from curiosity. These elements are necessary in order to maintain the status of the proceeding as being judicial in nature and therefore within the constitutional powers of the courts.

Id. at 1170 (quoting May v. Holley, 59 So.2d 636, 639 (Fla.1952)) (alteration in original). This same reasoning was espoused in Santa Rosa County v. Administration Commission, 661 So.2d 1190 (Fla. 1995), where the Court noted:
[I]t is well settled that "Florida courts will not render, in the form of a declaratory judgment, what amounts to an advisory opinion at the instance of parties who show merely the possibility of legal injury on the basis of a hypothetical `state of facts which have not arisen' and are only `contingent, uncertain, [and] rest in the future.'"
Id. at 1193 (quoting LaBella v. Food Fair, Inc., 406 So.2d 1216, 1217 (Fla. 3d DCA 1981)) (emphasis added).
It is clear that by the time Olive filed the amended complaint he had acknowledged that he would not sign a contract for representation of Mungin and that Judge Moran had revoked his appointment and appointed other counsel.[13] Indeed, despite the majority's euphemistic characterization that Olive "declined to be limited by the terms of the contract," Olive expressly declined to represent Mungin. He therefore had no contract, no client, no case and no real facts to support his various claims. To the extent Olive believed that sections 27.710 and 27.711 provided for less than adequate compensation, he had no client who could assert that effective representation was impaired. Nor did he have a contract the lower court could construe, as he had refused to sign one.
In sum, Olive had no contractual right then in doubt and no legal relationship that was affected by sections 27.710 and 27.711. Although Olive argued below that he was entitled to bring a declaratory judgment action because the rights at issue would arise in the future, that is not so; they could not arise if he never signed a contract and never represented a capital defendant. Only if he signed a contract could a client's rights or his own rights ever be at issue.
Olive's claims for relief under counts I and II of the amended complaint were based entirely on speculation and hypothesis, rather than on a present controversy or state of facts. The very decisions on which Olive relied below to support his claim demonstrate that the appropriate means of challenging fee limits like those in section 27.711 is by undertaking and completing representation of the defendant, documenting the actual work performed in the case, justifying compensation in excess of the statutory fee limits, and then allowing a trial court to make an after-the-fact determination, based on the actual, existing record. See, e.g., White v. Board of County Comm'rs of Pinellas County, 537 So.2d 1376, 1379, 1380 (Fla. 1989) (declining to find statutory fee limit on attorney compensation unconstitutional "on its face," but holding that "[i]n determining *659 whether to exceed the statutory maximum fee cap, the focus should be on the time expended by counsel and the impact upon the attorney's availability to serve other clients, not whether the case was factually complex").
Though White is not a case specifically addressing standing, it provides an example of the appropriate means of challenging statutory fee limits for the representation of indigent defendants in capital cases, i.e., when a case is ripe enough that an actual case or controversy exists. In White, unlike Olive in this case, the attorney challenging the statute "had expended a total of 134 reasonable and necessary hours, including 63 hours in court, over a period of 3½ months representing his client." White, 537 So.2d at 1377. Because the attorney waited until the conclusion of his representation of the defendant, this Court was able to make an after-the-fact determination of the validity of the statute, based on the actual, existing record. Any alleged actions taken by Olive prior to signing a contract authorizing his representation of Mungin would be insufficient to give Olive standing to challenge the terms of the contract. In short, I conclude that Olive's complaint was premature because it was premised on speculative facts and contingencies that may or may not occur, and that the trial court's entry of declaratory judgment as to counts I and II amounted to an advisory opinion.[14]
Furthermore, Holley v. Adams, 238 So.2d 401 (Fla.1970), upon which the majority relies, is distinguishable, and the instant case does not, as the majority argues, "present a situation similar to that reviewed in Holley." In Holley, this Court specifically considered the actions of the party seeking declaratory relief and found such actions demonstrated a high probability that the party would be affected by the statute at issue; therefore, the Court determined that the action for declaratory judgment was appropriate. See Holley, 238 So.2d at 403-04.
In particular, this Court noted that Holley (a circuit judge seeking the office of justice of the Supreme Court of Florida and challenging the constitutionality of a "resign-to-run" statute) specifically alleged in his complaint that he intended to be a candidate, publicly announced his intention to be a candidate, designated a campaign treasurer, set up a campaign collection and deposit fund, and filed with the Secretary of State a declaration of his intention to be a candidate. See id. at 404.
In contrast to the affirmative actions taken by Holley to become a candidate for office, Olive took no actions to demonstrate his intention to represent Mungin or any death penalty defendant. The majority asserts, "Olive began performing his duties as counsel to Mr. Mungin...." However, aside from observing that Olive allegedly "initiat[ed] a meeting with his client" (prior to expressly declining the appointment), the majority fails to provide any detail as to what "duties" Olive began performing on behalf of Mungin. Moreover, in footnote 4 of its opinion, the majority asserts *660 Olive "did everything possible to represent Mr. Munginexcept sign a legally questionable contract" but, again, fails to provide any detail which might compare to those actions taken by Holley in furtherance of his candidacy. On the contrary, Olive declined to sign the contract accepting his appointment and reaffirmed his intentions by expressly indicating in his letter to Judge Moran that Mungin had "no counsel." Indeed, Olive took no actions in furtherance of the representation of Mungin that would compare to those actions taken by Holley in furtherance of his candidacy.[15]
The majority states that Olive's placement on the registry is sufficient indication of Olive's intentions. But this action occurred prior to his decision not to accept his appointment. Olive's express rejection of the appointment obviated any such "intention" on Olive's behalf to represent Mungin that might be inferred from Olive's prior placement on the registry. Also, the majority's acknowledgment that removal of Olive's name from the registry was "entirely logical" actually defies logic and contradicts the premise underlying the majority's holding in this case. If Olive's actions in this case were such that is was "entirely logical" for Olive's name to be removed from the registry, how could these same actions also support the notion that Olive has standing to contest provisions of a contract for services he has declined to provide and, as a result of the removal of his name from the registry, may never provide?
Indeed, Olive's action in this case, i.e., declining to accept his appointment and expressly rejecting representation of Mungin, appear to be even less persuasive than those actions by the party seeking a declaratory judgment in Bryant v. Gray, 70 So.2d 581 (Fla.1954), where this Court found declaratory relief inappropriate. As this Court noted in Holley, the party bringing suit in Bryant only alleged that he "desired" to be a candidate and "might be" a candidate for the next term; therefore, this Court determined the action to be "hypothetical" and "too uncertain as to contingencies to warrant declaratory relief." Holley, 238 So.2d at 404. Similar to Olive's situation in the instant case, there was simply no probability of certainty that the party seeking relief in Bryant would be affected by the terms of the statute (or contract) in question.
Accordingly, I find Olive's actions in this case distinguishable from those of the party seeking declaratory relief in Holley, and because Olive failed to sign the contract and expressly rejected his appointment to represent Mungin, I conclude that Olive does not have standing to bring a declaratory judgment action. I also conclude that, based on the circumstances of this case, this Court is without jurisdiction to issue an advisory opinion and, therefore, I cannot join the majority its discussion of the merits of this case.
WELLS, C.J., and QUINCE, J., concur.
NOTES
[1] Prior to initiating this action Olive had filed an earlier petition, in October 1998, before his appointment was revoked, seeking to invoke this Court's all writs jurisdiction and challenging the constitutionality of sections 27.710 and 27.711, Florida Statutes (Supp. 1998). The Court denied the petition without an opinion on February 11, 1999. See Mungin v. State, 729 So.2d 393 (Fla.1999).
[2] Maas contends that he should not be a party in this case because pursuant to chapter 2000-3, Laws of Florida, he is no longer responsible for managing the contract in question. Instead, that responsibility was shifted, effective January 14, 2000, to the Comptroller. See § 27.710(4), Fla. Stat. (2000). Mr. Olive, on the other hand, asserts that Mr. Maas should still be a party in this case because he is responsible for maintaining the registry of available attorneys. See § 27.710(1), Fla. Stat. (2000). We agree with Olive that Maas is still a proper party.
[3] See generally Martinez v. Scanlan, 582 So.2d 1167, 1170 (Fla.1991); May v. Holley, 59 So.2d 636, 639 (Fla.1952); State Farm Fire & Cas. Co. v. Higgins, 788 So.2d 992 (Fla. 4th DCA 2001), review granted, 794 So.2d 604 (Fla.2001); Conley v. Morley Realty Corp., 575 So.2d 253, 254 (Fla. 3d DCA 1991).
[4] We respectfully disagree with the dissent when it states that Holley is distinguishable from the instant case because "Olive took no actions to demonstrate his intention to represent Mungin." Dissenting op. at 659. To the contrary, as we detail fully above, Olive did everything possible to represent Mr. Mungin except signing a legally questionable contract. Likewise, the dissent's reliance upon White v. Board of County Commissioners of Pinellas County, 537 So.2d 1376 (Fla.1989), is also misplaced. As White does not even address the issue of standing, it is entirely inapposite on that issue.
[5] Moreover, had Olive signed the contract at issue here, he most certainly would have faced arguments from the respondents that he had already agreed to undertake representation pursuant to the contract, and, therefore, he had waived any claim pertaining to the appointment or the contract. This identical argument was asserted by the City of Jacksonville in Sheppard & White, P.A. v. City of Jacksonville, No. SC00-331 (Fla. oral argument heard January 5, 2001), in support of the City's position that attorney Sheppard had waived any arguments relating to compensation once he had agreed to the appointment.
[6] There is no question that the terms of the contract submitted to Olive for execution could not be altered. The objectionable statutory limitations upon avenues of advocacy and financial consideration were clearly delineated within this non-negotiable document.
[7] The fee schedule is as follows:

(4) Upon approval by the trial court, an attorney appointed to represent a capital defendant under s. 27.710 is entitled to payment of the following fees by the Comptroller:
(a) Regardless of the stage of postconviction capital collateral proceedings, the attorney is entitled to $100 per hour, up to a maximum of $2,500, after accepting appointment and filing a notice of appearance.
(b) The attorney is entitled to $100 per hour, up to a maximum of $20,000, after timely filing in the trial court the capital defendant's complete original motion for postconviction relief under the Florida Rules of Criminal Procedure. The motion must raise all issues to be addressed by the trial court. However, an attorney is entitled to fees under this paragraph if the court schedules a hearing on a matter that makes the filing of the original motion for postconviction relief unnecessary or if the court otherwise disposes of the case.
(c) The attorney is entitled to $100 per hour, up to a maximum of $20,000, after the trial court issues a final order granting or denying the capital defendant's motion for postconviction relief.
(d) The attorney is entitled to $100 per hour, up to a maximum of $20,000, after timely filing in the Supreme Court the capital defendant's brief or briefs that address the trial court's final order granting or denying the capital defendant's motion for postconviction relief and the state petition for writ of habeas corpus.
(e) The attorney is entitled to $100 per hour, up to a maximum of $10,000, after the trial court issues an order, pursuant to a remand from the Supreme Court, which directs the trial court to hold further proceedings on the capital defendant's motion for postconviction relief.
(f) The attorney is entitled to $100 per hour, up to a maximum of $4,000, after the appeal of the trial court's denial of the capital defendant's motion for postconviction relief and the capital defendant's state petition for writ of habeas corpus become final in the Supreme Court.
(g) At the conclusion of the capital defendant's postconviction capital collateral proceedings in state court, the attorney is entitled to $100 per hour, up to a maximum of $2,500, after filing a petition for writ of certiorari in the Supreme Court of the United States.
(h) If, at any time, the Supreme Court of the United States accepts for review the capital defendant's collateral challenge of the conviction and sentence of death, the attorney is entitled to $100 per hour, up to a maximum of $5,000. This payment shall be full compensation for representing the capital defendant throughout the certiorari proceedings before the United States Supreme Court.
The hours billed by a contracting attorney under this subsection may include time devoted to representation of the defendant by another attorney who is qualified under s. 27.710 and who has been designated by the contracting attorney to assist him or her. § 27.711(4), Fla. Stat. (2000). Additionally, funding for other expenses is also provided for in subsections (5) through (7):
(5) An attorney who represents a capital defendant may use the services of one or more investigators to assist in representing a capital defendant. Upon approval by the trial court, the attorney is entitled to payment from the Comptroller of $40 per hour, up to a maximum of $15,000, for the purpose of paying for investigative services.
(6) An attorney who represents a capital defendant is entitled to a maximum of $15,000 for miscellaneous expenses, such as the costs of preparing transcripts, compensating expert witnesses, and copying documents. Upon approval by the trial court, the attorney is entitled to payment by the Comptroller of up to $15,000 for miscellaneous expenses, except that, if the trial court finds that extraordinary circumstances exist, the attorney is entitled to payment in excess of $15,000.
(7) An attorney who is actively representing a capital defendant is entitled to a maximum of $500 per fiscal year for tuition and expenses for continuing legal education that pertains to the representation of capital defendants. Upon approval by the trial court, the attorney is entitled to payment by the Comptroller for expenses for such tuition and continuing legal education.
§ 27.711(5)-(7), Fla. Stat. (2000).
[8] Olive's objection specifically relates to section 27.711(9), Florida Statutes (Supp.1998) (currently § 27.711(10), Fla. Stat. (2000)), which reads in pertinent part: "This section does not authorize an attorney who represents a capital defendant to file repetitive or frivolous pleadings that are not supported by law or by the facts of the case." Olive also challenges section 27.711(1)(c), explaining that "[p]ostconviction capital collateral proceedings... does not include repetitive or successive collateral challenges to a conviction and sentence of death which is affirmed by the Supreme court and undisturbed by any collateral litigation."
[9] Olive filed a notice of supplemental authority directing this Court's attention to the United States Supreme Court's recent decision in Legal Services Corporation v. Velazquez, 531 U.S. 533, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001). This decision, however, does not seem to advance any of Olive's positions with respect to the types of claims which he may or may not raise. Specifically, in Velazquez, the Court, based on First Amendment grounds, struck a provision made binding on the Legal Services Corporation (i.e., an entity receiving federal funding for purposes of providing legal assistance in noncriminal proceedings to persons financially unable to afford such assistance), which forbade corporation attorneys to advocate to amend or challenge existing welfare laws. The Court held that the federal government could not insulate its laws from judicial scrutiny in such a way. See id. at 1051. The situation in this case is far different from that which the Court reviewed in Velazquez; there is no prohibition in sections 27.710 or 27.711 which would prohibit a registry attorney from making a good faith argument challenging the validity of a statute.
[10] Olive's challenge relates to section 27.711(10), Florida Statutes (Supp.1998) (currently § 27.711(11), Fla. Stat. (2000)), which indicates:

An attorney appointed under s. 27.710 to represent a capital defendant may not represent the capital defendant during a retrial, a resentencing proceeding, a proceeding commenced under chapter 940 [executive clemency], a proceeding challenging a conviction or sentence other than the conviction and sentence of death for which the appointment was made, or any civil litigation other than habeas corpus proceedings.
[11] Paragraph 6 of the contract requires postconviction counsel to

permit public access to all documents, papers, letters, or other materials subject to the provisions of Chapter 119, Florida Statutes, and made or received by Contractor in conjunction with this contract. Such materials shall not be provided to any person not a party to this contract, except the CAJCC, without prior approval by Commission. If there is disagreement between Commission and Contractor as to what is a public record, the opinion of Commission will govern. Nothing herein, however, shall require the production of material covered by the attorney-client privilege.
[12] "Florida recognizes a general standing requirement in the sense that every case must involve a real controversy as to the issue or issues presented." Dep't of Revenue v. Kuhnlein, 646 So.2d 717, 720-21 (Fla.1994) (citing Interlachen Lakes Estates, Inc. v. Brooks, 341 So.2d 993 (Fla.1976)). Without such standing, parties are prohibited from requesting advisory opinions, "except in those rare instances in which advisory opinions are authorized by the Constitution." Kuhnlein, 646 So.2d at 721 (recognizing that article IV, section 1(c), Fla. Const., permits advisory opinions for the Governor in certain circumstances); see also art. V, § 3(b)(10), Fla. Const. (permitting advisory opinion for the Attorney General in certain circumstances).
[13] The record reflects that Wayne F. Henderson was appointed to represent Mr. Mungin. See Second Affidavit of Roger R. Maas, Record on Appeal at 540, 543.
[14] Indeed, count I of the amended complaint appears to be nothing more than a transparent attempt to have the trial court declare, on constitutional grounds and in advance of representation, that Olive was entitled to more money for fees and costs in representing Anthony Mungin than provided for by section 27.711 simply on the basis of Olive's belief that he would spend more time on the case than the statute contemplated. Moreover, count II appears to be nothing more than an attempt to have the court adjudicate hypothetical ethical conflicts that might never occur even if Olive did represent Anthony Mungin. I note, however, that if and when actual disputes arise which require the interpretation of a signed contract for appointment as registry counsel, section 27.710, or section 27.711, courts will be available to address and resolve bona fide issues.
[15] I would question the majority's characterization of the contract being an "legally questionable" one. The majority's holding is only that trial courts are authorized to grant fees in excess of the statutory schedule where "extraordinary and unusual circumstances exist in capital cases" and that the contract would not require an appointed attorney to violate ethical duties. Certainly such a holding does not warrant a characterization as a "legally questionable" contract.