PER CURIAM.
This case arises from the denial of a motion for reimbursement of investigative fees in a capital postconviction proceeding, where the investigative fees exceeded the statutory cap for investigative expenses by an additional $1,844.[1] The Florida Department of Financial Services (DFS) denied payment based solely on the fact that the expenses exceeded the statutory cap for investigative expenses. DFS takes the position that it is without authority to pay the amount in excess of the statutory cap unless authorized by court order. Neither DFS nor the State objects to the payment of the expenses, and there is no contention that the investigative expenses were unnecessary or unreasonable.
We reverse the trial court’s order because the trial court improperly focused on whether this was an “ordinary” capital case, as opposed to reviewing whether there were “extraordinary or unusual circumstances” that required defense counsel to exceed the statutory cap for investigative expenses. Based on a review of the record, we conclude that counsel’s actions and the expenses incurred were reasonable and necessary and that the case presented *894 “extraordinary or unusual circumstances” that required defense counsel to exceed the statutory cap for investigative services.
FACTS
Because the investigative expenses at issue were incurred in investigating new facts that counsel claimed established doubt about the defendant’s guilt, we briefly review the facts. The defendant, Thomas James Moore, was convicted of robbing and killing Johnny Parrish, with whom he was friends, based on the following:
On January 21, 1993, at about 3 p.m., Moore sat outside Parrish’s house drinking with the victim. Moore claims that two other youths, Clemons and Gaines, approached the house. Moore claimed he saw the pair chase a neighborhood youth named “Little Terry” with a gun earlier that day, but Clemons denied it at trial. Clemons and Gaines testified that they had a conversation with Moore about robbing Parrish. Clemons said he agreed to go in the house with Moore, and Gaines was to be the lookout. Gaines said he stood outside but did not see either man go in. He said he heard two shots and then saw Clemons come out of the house and go back in. When Gaines started to walk away, Clemons caught up with him and told him Moore had shot Parrish.
Clemons said that when he and Moore went into the house, Moore pulled out a gun. Moore asked Parrish where his money was and then shot him when he got no response. Later, neighbors saw smoke in Parrish’s house and ran in and pulled out Parrish. Parrish was already dead when exposed to the fire, and a fire investigator, Captain Mattox, said that there were two separate fires in the house, both of which were intentionally set.
A witness named Shorter testified that Moore brought him a bag of clothes and asked him to burn them. Shorter also testified that Moore told him he had shot Parrish and set fire to the house. Shorter stated that Moore said he shot Parrish twice, that Clemons ran out of the house, and that Moore took the top off a lawn mower he found and set it on fire to clean the house of fingerprints. Shorter did not call the police but did call his mother, who called the police.
A jail inmate, Jackson, testified that Moore told him that he did not mean to kill Parrish but had to because Parrish would recognize him. Another neighbor, Dean, testified that Moore asked him to rob Parrish.
Moore v. State, 701 So.2d 545, 547 (Fla.1997). The jury recommended a sentence of death, and the judge followed this recommendation. After Moore unsuccessfully sought postconviction relief, this Court affirmed the denial of postconviction relief and denied his petition for a writ of habeas corpus. See Moore v. State, 820 So.2d 199, 202 (Fla.2002).
On September 10, 2003, Martin McClain was appointed as registry counsel for Moore and later executed a contract with DFS.[2] In 2005, McClain contracted with private investigator Daniel Ashton to work on Moore’s case. Ashton obtained all of the prior records in the case and reviewed the files, compiling a list of witnesses to interview. He subsequently conducted numerous interviews with various individuals, including people who had been incarcerated with Moore’s codefendants, Vincent Gaines and Carlos Clemmons,[3] when they *895 were first arrested for the murder of the victim in this case. A number of individuals stated that Gaines and Clemmons had made incriminating statements to them shortly after they were arrested. Based on the newly discovered evidence that Ash-ton uncovered, McClain filed a successive postconviction motion on January 26, 2006. The trial judge, Judge John D. Southwood, ordered an evidentiary hearing, which was held on March 22, 2011 — over five years after the successive motion was filed. Before the hearing, McClain requested that Ashton locate the witnesses needed for the hearing and interview them again to ensure their testimony had not changed.
At the evidentiary hearing, McClain presented four witnesses who asserted that they were incarcerated with Clemmons and Gaines in juvenile detention, during which time either Clemmons or Gaines made incriminating statements shortly after the murder. David Hallback testified that he knew Clemmons when they were incarcerated together because they attended the same school. During their incarceration, Clemmons admitted that he and Gaines went to the victim’s house because they knew that there was a safe in the victim’s house and the victim sold moonshine; however, Clemmons and Gaines had to wait for Moore to leave because Moore was the victim’s best friend and would not have “let them do that.”
Mandell Rhodes testified that while he was incarcerated with Gaines and Clem-mons, Clemmons told Rhodes that although he was the one who killed the victim, he was going to blame the crime on the oldest guy because the State had given Clemmons an escape since he was so young. Rhodes also testified that Gaines and Clemmons had used a chrome handgun, but Rhodes did not know the caliber.
Raimundo Hogan testified that when he was at the juvenile facility with Clemmons and Gaines, Gaines told him that during a robbery, Clemmons shot the victim with a .38 handgun that had been stolen from a black Mustang. In addition, Clemmons said they were going to blame a “nobody,” meaning that he did not have family or friends that would “get some get-back” after they blamed him for the crime.
Charles Simpson testified for the defense as well, asserting that when he was incarcerated in the juvenile facility with Clemmons and Gaines, both of whom he knew, Clemmons said the “older guy took the rap.” In addition, Simpson testified that he saw Clemmons pull a chrome .38 handgun on another individual about a day before the murder. Defense counsel also called Michael Dean, who had testified at the trial. Dean stated that he was at the victim’s house, but after he went home, he saw Vincent Gaines standing outside the victim’s house.
Wilhelmina Moore, the defendant’s mother, testified that a few years after Moore was convicted of the murder, a trial witness named Chris Shorter approached her at a neighborhood service station while she was pumping gas and said, “I don’t mean no harm, but I had to do what I had to do because I had to think about my children.” She refused to talk to him and kept the information to herself because she was not sure whether the information would help or hurt her son.
McClain then called John Jackson, who was Moore’s prior postconviction attorney at Capital Collateral Regional Counsel-North (CCRC-North). Jackson discussed his unsuccessful attempts to find Gaines and numerous other witnesses that he wanted to interview. Finally, defense investigator Ashton testified as to the investigation that he performed and the interviews that he conducted in connection with the case. Ashton also testified that he spoke with codefendant Gaines in 2005 and that Gaines provided some statements that were inconsistent with his trial testimony, *896 including his admission that on the day of the murder, he and Clemmons chased a person named Little Terry around a park with a chrome-plated .38 handgun that was stolen from a black Mustang at the Imperial Estates Apartments three weeks prior.
After the defense rested, the State called Carlos Clemmons, who denied having a gun, denied telling anybody that he was setting up an adult, denied telling anybody that he stole a gun from a Mustang, and denied that he ever told anybody that Moore was innocent. Vincent Gaines was the State’s final witness. He also denied that he told anybody that Moore was innocent and denied that he and Clem-mons committed the crime by themselves. While he admitted that he had chased Little Terry, he denied chasing him with a gun. At the conclusion of the evidence, the trial judge stated as follows:
I have to make a decision as to whether or not — I don’t necessarily have to determine the truthfulness of any or all of these witnesses. I will tell everybody, for what it’s worth, that all of this testimony concerns me. Okay? I’m not at this point in time ready to absolutely disregard all of the testimony I’ve heard. I may. But the cumulative effect concerns me.... So for whatever that’s worth to you.
After the evidentiary hearing, McClain filed a motion for reimbursement of counsel, also requesting that the court issue an order directing the payment of his investigative fees including the additional $1,844 fees at issue in this case. In the motion, McClain asserted that the investigative fees exceeded the statutory cap because the fees were based on six years of investigation and included interviews with a significant number of witnesses who had been incarcerated with Clemmons and Gaines in the juvenile facility in 1993. In addition, he asserted that investigative services were necessary to prepare for the March 2011 hearing — a hearing that also required lengthy testimony from the investigator himself, who was one of the main witnesses.
The Chief Judge of the Fourth Judicial Circuit heard the motion for reimbursement, even though he was not the judge who presided over the postconviction proceedings. At the hearing, McClain relied on his motion for reimbursement and the record in the case, including the transcript of the March 2011 hearing before Judge Southwood. In denying the motion for reimbursement, the chief judge recognized that while DFS and the State Attorney’s Office did not object to the request, their positions were not binding on the court. In relevant part, the trial court then analyzed the claim as follows:
5. In order for this Court to approve the excess fees, such fees must be reasonable pursuant to Florida Statute § 27.711(13);
6. In order for the attorney to be entitled to the excess fees, this Court must also find that “extraordinary circumstances” exist, as required by Florida Statute § 27.711(6);
7. This Court finds that this is an ordinary capital post-conviction case, involving an evidentiary hearing, and that the Defendant has not established that extraordinary or unusual circumstances existed that would have warranted an extra $1,844.00 investigator’s fees over and above the $15,000 already spent, as required by Florida Statute § 27.711(6).
McClain seeks review of this order.[4]
ANALYSIS
As both DFS and McClain recognize, the issue before this Court is whether this *897 postconviction capital ease presents extraordinary or unusual circumstances that would permit a departure from the statutory fee guidelines in order “to ensure that an attorney who has served the public by defending the accused is not compensated in an amount which is confiscatory.” Makemson v. Martin Cnty., 491 So.2d 1109, 1115 (Fla.1986).
In 1998, the Legislature enacted sections 27.710 and 27.711 of the Florida Statutes, which provide for a statewide registry of private attorneys who are available to represent indigent death row defendants in postconviction proceedings and establish the fee schedule that must be adhered to by private attorneys. The fee schedule provided in section 27.711(4) increased the fees that an attorney could receive in capital postconviction proceedings, and section 27.711(5) provided additional fee provisions pertaining to obtaining the assistance of an investigator:
(5) An attorney who represents a capital defendant may use the services of one or more investigators to assist in representing a capital defendant. Upon approval by the trial court, the attorney is entitled to payment from the Chief Financial Officer of $40 per hour, up to a maximum of $15,000, for the purpose of paying for investigative services.
§ 27.711(5), Fla. Stat. (2011).[5]
In Olive v. Maas, 811 So.2d 644, 653 (Fla.2002), this Court held that trial courts are authorized to award fees in excess of the statutory schedule set out in section 27.711 in capital cases “where extraordinary or unusual circumstances ex-ist.” The Court stressed that at the heart of the matter was an indigent defendant’s right to competent and effective representation — a right that could be in jeopardy if counsel could not be reasonably compensated for the legal services he or she was required to provide under the statutory fee limit. Olive, 811 So.2d at 653. In further support, the Court recognized that even the staff analysis to the statutory provisions explicitly acknowledged that the statutory fee caps “do not prevent a court from ordering payment above the maximum authorized” where unusual or extraordinary circumstances exist in capital collateral cases. Id. at 653-54 (quoting Fla. S. Comm. on Crim. Just., CS for SB 2054 Staff Analysis 7 (March 17, 1999), available at http://archive.flsenate.gov/ data/session/1999/Senate/bills/analysis/pdf/ SB2054.cj.pdf). Thus, as we held, the Legislature incorporated the standard set forth in Makemson, 491 So.2d at 1115, into section 27.711 by “patently acknowledging] that unless room is made to allow compensation in excess of the fee caps, a statutory framework may run afoul of this Court’s precedent in Makemson and its progeny.” Olive, 811 So.2d at 654; see also Maas v. Olive, 992 So.2d 196, 204 (Fla.2008) (holding that a trial court has the authority in appropriate capital collateral cases involving extraordinary circumstances to award compensation in excess of the statutory fee schedule but noting that the caps' would be exceeded only where “counsel requests additional compensation due to extraordinary and unusual circumstances, the trial court issues an order awarding such fees, and there is compe *898 tent, substantial evidence in the record to support fees in excess of the statutory limit”).
In this case, because the chief judge decided McClain’s motion for reimbursement of counsel based upon his review of the record and transcripts and did not take testimony, the order at issue does not involve credibility determinations or factual findings. Instead, as the order at issue is based entirely on written evidence, we examine the ruling in the same manner as any other order determining an issue of law on settled facts — whether the applicable issue of law was correctly decided, a de novo standard of review. See Philip J. Padovano, Florida Appellate Practice, § 19:2 at 358 n. 5 (2013 ed.); Bosem v. Musa Holdings, Inc., 46 So.3d 42, 44 (Fla.2010) (stating that pure issues of law are reviewed de novo).
Here, the chief judge correctly recognized that an attorney may be entitled to fees beyond the statutory maximum when “extraordinary circumstances” exist. However, the judge then denied the motion, summarily finding that Moore’s case presented “an ordinary capital postconviction case, involving an evidentiary hearing.” The judge did not elaborate on his ruling or provide any statement to indicate that he considered the defendant’s right to effective representation and the attorney’s right to fair compensation.
In denying the motion for reimbursement, the judge made the same error as occurred in White v. Board of County Commissioners of Pinellas County, 537 So.2d 1376, 1378 (Fla.1989), where the trial court misunderstood our prior precedent and applied it in such a manner that it required defense counsel to show that the case was sufficiently complex. A review of the Court’s precedent shows that this Court explicitly rejected the premise that in order to obtain fees beyond the statutory limit, counsel must show that the case itself is more complex. This is because even in “routine” capital cases, an attorney may be required to spend his or her time in a manner that is disproportionate to the maximum allowable fee. Id. at 1380.
Instead, the proper focus of the court’s review should be “on the ‘defendant’s right to effective representation rather than the attorney’s right to fair compensation,’ ” reviewing what was reasonable in light of an attorney’s professional obligation to provide services to the indigent defendant. Olive, 811 So.2d at 653 (quoting Makemson, 491 So.2d at 1114). Then, the court must perform an “as applied” analysis to determine whether the statutory cap would be confiscatory of the attorney’s time, energy, talent, and resources under the circumstances of the particular case. Id. at 654.
In turning to the facts presented here, nothing within the judge’s decision shows that the court below used an “as applied” analysis or that it considered the individual circumstances of this case, such as focusing on whether the expenses were necessary in fulfilling the role of defending Moore and whether requiring McClain to pay for investigative fees out of his own pocket would be confiscatory.
Our review of the record shows that McClain was entitled to reimbursement. First, the issue involved here was McClain’s reimbursement for investigatory expenses in finding numerous witnesses who provided similar statements that shortly after the codefendants were arrested, the codefendants admitted that they were responsible for the murder but blamed the crime on Moore. Specifically, investigator Ashton uncovered four witnesses who were incarcerated with the co-defendants shortly after they were arrested for the murder and these witnesses testified to similar statements. Moreover, investigator Ashton also talked to one of *899 the codefendants (Gaines) in 2005, during which Gaines allegedly admitted that on the day of the murder, he and codefendant Clemmons chased a boy around Grand Park with a chrome-plated .38 handgun that Clemmons possessed. This statement was consistent with some of the other witnesses’ statements that Clemmons had a chrome gun and that he had used it shortly before the murder. This was strong evidence that initially prompted Judge Southwood to remark, “all of this testimony concerns me.” In focusing on the defendant’s right to effective representation, the investigatory fees at issue here were both reasonable and necessary in order to fulfill McClain’s role as Moore’s defense counsel.
Second, as is clear from the testimony presented at the hearing, the investigator had to conduct substantial investigation to discover the evidence at issue. In fact, initial postconviction counsel testified at the evidentiary hearing that he had wanted to interview these witnesses earlier but was unable to discover their locations. Investigator Ashton was able to track down various potential witnesses who were incarcerated with the codefendants as juveniles in 1993, and when he interviewed them, they provided exculpatory evidence. Based on the success of the investigation, defense counsel filed a successive motion for postconviction relief based on the newly discovered evidence and then presented a total of eight witnesses at the evidentiary hearing. At the time the postconviction motion was filed, the investigative fees did not exceed the statutory maximum. However, since the evidentiary hearing did not occur until over five years later, the investigator was required to relocate the witnesses and ensure that their testimony had not changed.
Third, investigator Ashton was required to testify—both as to the work that he performed in connection with this case and as to the incriminatory statements that codefendant Gaines made when Ash-ton first interviewed him in 2005. Again, this additional investigatory work was important to Moore’s defense.
As a final consideration, McClain asserts that in this case, he did not exhaust the statutory fees to which he would be entitled and that he could have performed the investigatory services himself. However, by having an investigator perform these services, he actually saved the State money. In particular, under the statutory framework, if McClain would have undertaken such tasks, he would be entitled to $100 per hour for his time, see § 27.711(4), Fla. Stat. (2011) (setting the statutory rate for attorneys at $100 per hour), but by delegating the tasks to an investigator, he saved the State $60 per hour, see § 27.711(5), Fla. Stat. (2011) (setting the statutory rate for investigators at $40 per hour).
All of the above considerations can be considered unusual circumstances and would justify exceeding the statutory cap in this case. Mandating that counsel must personally bear the expense of investigatory fees beyond the cap is contrary to our prior decisions where we have consistently discussed that inadequate funding would cause counsel to face “an economic disincentive ... to spend more than a minimum amount of time on the case.” Freeman, 921 So.2d at 600. Such a result is even more troubling where the evidence uncovered to support a postconviction motion is relatively strong on its face and requires an evidentiary hearing in order for the judge to make necessary credibility decisions. In light of the attorney’s professional obligation to his indigent death-sentenced client and the need to engage in extended investigation to uncover witnesses that could cast doubt on the defendant’s guilt, we conclude that the circum *900 stances of this case were extraordinary or unusual circumstances that required defense counsel to exceed the statutory cap.
CONCLUSION
For the above reasons, we conclude that the trial court erred in denying the motion for reimbursement in excess of the statutory limit. We therefore reverse the trial court’s order and remand this case to the trial court with instructions to grant the motion in accordance with this opinion.
It is so ordered.
PARIENTE, LEWIS, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., specially concurs with an opinion, in which LABARGA and PERRY, JJ., concur.
QUINCE, J., concurs in result only.
POLSTON, C.J., dissents.
CANADY, J., dissents with an opinion, in which POLSTON, C.J., concurs.

. Because the order concerns the payment of certain fees that were incurred during a post-conviction death penalty proceeding filed under Florida Rule of Criminal Procedure 3.851, this Court has jurisdiction under article V, section 3(b)(1), of the Florida Constitution. See also Fla. Dep’t of Fin. Servs. v. Freeman, 921 So.2d 598, 598 (Fla.2006).

. McClain was initially appointed to represent Moore in an appeal from the denial of relief on a claim premised on Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

. In the record before this Court, Clemmons’ name is spelled as “Clemmons” but on direct appeal, it is spelled "Clemons.”

. After this motion for reimbursement was denied, the trial court subsequently denied the motion for postconviction relief. Moore seeks review of the denial of relief in a sepa *897 rate appeal. See Moore v. State, No. SC12-459.

. Section 27.711 has been amended at various times, including the amount of compensation to which defense counsel is entitled under section 27.711(4). However, since its introduction, subsection (5) has remained substantially the same, including providing a $15,000 statutory cap for investigative fees. The only difference is that the Legislature amended this provision to state that defense counsel seeks payment from the Chief Financial Officer now, as opposed to the Comptroller.